Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com
robl@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GARY FEITELSON, a Kentucky resident, DANIEL MCKEE, an Iowa resident, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE INC., a Delaware corporation, <br><br> Defendant. | No. 5:14-cv-02007 <br><br> FIRST AMENDED CLASS ACTION COMPLAINT <br><br> COMPLAINT FOR VIOLATION OF THE SHERMAN ANTITRUST ACT, CLAYTON ANTITRUST ACT, CALIFORNIA CARTWRIGHT ACT, AND CALIFORNIA UNFAIR COMPETITION LAW <br><br> **DEMAND FOR JURY TRIAL OF ANY ISSUES SO TRIABLE** |

**TABLE OF CONTENTS**

<u>Page</u>

I.     INTRODUCTION ......................................................................................... 1

II.    JURISDICTION ........................................................................................... 5

III.   PARTIES ...................................................................................................... 5

IV.   RELEVANT FACTS .................................................................................... 6

     A.    Google is a monopolist in general search. ...................................... 6

     B.    Google is a monopolist in handheld general search. ....................... 8

     C.    Google engages in unlawful behavior in order to restrain trade and to maintain and grow its monopoly in the search markets at issue. ......................... 10

           1.    Google has been the subject of, and has settled, various antitrust investigations. ................................... 11

           2.    Google restrains and injures competition through the use of its Mobile Application Distribution Agreements. ......................... 13

           3.    Google conceals its MADA restrictions. ....................... 18

           4.    Google further forecloses competition in the markets at issue by entering into exclusive contracts with Apple. ............................... 20

           5.    Achieving default search engine status is by far the most effective and cost-efficient way to distribute search engines. ......................... 21

     D.    Google's practices with respect to its search product and apps restrain and injure competition in markets where already there are high barriers to entry. ......................... 24

     E.    Google's unlawful practices harm consumers. ................................. 29

           1.    Google harms consumers by killing competition, stifling innovation, and diminishing consumer choice. ................ 29

           2.    Google harms consumers by causing supra-competitive pricing of affected Android OS devices. ....................... 30

V.     INTERSTATE TRADE AND COMMERCE ............................................. 31

VI.   RELEVANT MARKETS ........................................................................... 31

     A.    Plaintiffs' allegations involve two relevant markets. ...................... 31

           1.    General search ................................................................ 31

           2.    Handheld general search ................................................ 33

B. The injuries that plaintiffs have suffered are inextricably intertwined with the general search and handheld general search markets. ...................................................................... 33

VII. CLASS ALLEGATIONS ...................................................................... 34

VIII. CLAIMS FOR RELIEF ...................................................................... 37

FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1) ...................................................................... 37

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION (15 U.S.C. § 2) ...................................................................... 38

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) ...................................................................... 39

FOURTH CAUSE OF ACTION VIOLATION OF THE CLAYTON ACT (15 U.S.C. § 14) ...................................................................... 41

FIFTH CAUSE OF ACTION VIOLATION OF THE CARTWRIGHT ACT (CAL. BUS. & PROF. CODE § 16727) ...................................................................... 42

SIXTH CAUSE OF ACTION VIOLATION OF THE UNFAIR COMPETITION ACT (CAL. BUS. & PROF. CODE §§ 17200, *et seq.*) ...................................................................... 43

PRAYER FOR RELIEF ...................................................................... 44

JURY TRIAL DEMANDED ...................................................................... 45

FIRST AMENDED CLASS
ACTION COMPLAINT

- ii -

010437-11  707082 V1

I.     INTRODUCTION

1.     In 2006 a "fast-rising Internet star" complained to the U.S. Department of Justice and the European Commission about what it said was a rival's plan to "unfairly grab Web traffic and advertising dollars from its competitors." ("New Microsoft Browser Raises Google's Hackles," *The New York Times*, May 1, 2006 (http://www.nytimes.com/2006/05/01/technology/01 google.html?pagewanted=print&_r=0) (last accessed July 31, 2014).) That fast-rising star was the defendant in this action, Google Inc. ("Google"). And Google's own complaint to antitrust authorities was based on the very same sort of anti-competitive behavior regarding Internet search that is at issue in this suit.

2.     Specifically, Google was complaining to antitrust enforcers about Microsoft's purported plans to make a Microsoft product the default search engine in a query box that Microsoft was adding to a new iteration of Internet Explorer. (*Id.*) As the *New York Times* reported:

> The new browser includes a search box in the upper-right corner that is typically set up to send users to Microsoft's MSN search service. Google contends that this puts Microsoft in a position to unfairly grab Web traffic and advertising dollars from its competitors.
>
> The move, Google claims, limits consumer choice and is reminiscent of the tactics that got Microsoft into trouble in the late 1990's.
>
> "The market favors open choice for search, and companies should compete for users based on the quality of their search services," said Marissa Mayer, the vice president for search products at Google. "We don't think it's right for Microsoft to just set the default to MSN. We believe users should choose."
>
> * * *
>
> The focus of Google's concern is a slender box in the corner of the browser window that allows users to start a search directly instead of first going to the Web site of a search engine like Google, Yahoo or MSN. Typing a query and hitting "Enter" immediately brings up a page of results from a designated search engine . . . . Google estimates that the boxes, when available, are the starting point for 30 to 50 percent of a user's searches, making them a crucial

gateway to the lucrative and fast-growing market for advertisements that appear next to search results.

(*Id.*)  According to the *Times*, it was after Google's direct objections to Microsoft "went unresolved" that Google "took the matter to antitrust authorities in Europe and the United States …." (*Id.*)  "Google . . . informed the European authorities of its worry that 'Microsoft's approach to setting search defaults in Internet Explorer 8 benefits Microsoft while taking away choice from users.'" (*Id.* (quoting Steve Langdon, a Google spokesperson).)

3.      Indeed, Google proffered a solution to the issue:

> The best way to handle the search box, Google asserts, would be to give users a choice when they first start up Internet Explorer 7.  It says that could be done by asking the user to either type in the name of their favorite search engine or choose from a handful of the most popular services, using a simple drop-down menu next to the search box.

(*Id.*)  And Google went even further.  As the *Times* noted, the Firefox and Opera browsers came with Google set as the default, but Google's Ms. Mayer "said Google would support unfettered choice on those as well." (*Id.*)  So a few short years ago, Google was all about choice and viable competition where search was concerned.  But as plaintiffs demonstrate in this complaint, since then Google has changed course aggressively in violation of antitrust and fair competition law.  It now uses its immense power to deny users the kind of choice it said they ought to have and to crush competition in the process.

4.      Google has long been a monopolist in the overall U.S. market for general Internet search (hereafter "general search").  Google search is the Internet's most powerful tool, and "to Google" has become synonymous with searching the Internet.  Internet search has made Google the largest, and the most profitable, web-centric company in America.

5.      Google also is a monopolist in the large and fast-growing American market for mobile and tablet general Internet search (hereafter "handheld general search").  But Google's maintenance and expansion of its monopoly in handheld general search, and, by extension, general search, is not merely a function of having built a better search engine.  Instead, Google exploits its

Android mobile operating system ("Android OS") to maintain and expand its monopoly in both of these U.S. markets.

6.      In 2005, having recognized that personal computing was moving away from the desktop and that Internet searches increasingly are being done on smartphones and tablets, Google purchased the Android OS.  By giving away the Android OS for free, Google in a few short years has built an enormous – and lucrative – user base in the United States.

7.      Of course, Android itself only enables the basic functionality of a handheld device; what brings mobile phones and tablets to life are applications.  Some of the most popular handheld-device applications, including the YouTube video app and the Google Play client (which enables shopping in Google's app store), also are Google properties.  As Google well knows, customers expect to see these apps on their Android devices.  So Google, by way of secret contracts called Mobile Application Distribution Agreements ("MADA"), allows Android OS device manufacturers to pre-load a suite of Google apps including the YouTube app and Google Play client, among others, onto a phone or tablet – but *only* if the manufacturer pre-loads onto prime screen real estate *all* of the apps in the suite, whether the manufacturer wants all of them or not.

8.      Among the suite of apps covered by Google's MADAs is the Google Phone-top Search app – an application for conducting web searches via Google's search engine.  This case arises because of recent revelations that Google has restrained trade and abused its market power by requiring distributors to install the Google Phone-top Search app and to "set" it "as the default search provider for all Web search access points," including the Internet browser, on phones or tablets subject to its MADAs.  As Google well knows, consumers do not know how to switch, nor will they go to the trouble of switching, the default search engine on their devices.  (*See id.* (per a study that Google itself commissioned, "only a third of users could master the four-click process to change the default [search engine]" in a browser – and presumably this would assume that users even understood that there was a default at all).)  Thus, compelling device manufacturers to make Google the default search engine on affected devices is a highly effective means of ensuring that consumers will use Google search, rather than one of its competitors' search products, to conduct general Internet queries on their phones and tablets.  And of course, extending its dominance in

FIRST AMENDED CLASS
ACTION COMPLAINT                                    - 3 -

010437-11  707082 V1

search is at the core of Google's business strategy – Google badly wants default search engine status on as many devices as possible because that status results in more paid search-related advertisements, which are the source of most of its billions and billions of dollars in annual profits.

9.    But if device manufacturers bound by Google's distribution agreements were free to choose a default search engine other than Google, the quality of Internet search overall would improve.  This is because search engines become more effective as they process more and more search queries.  So if Google's search competitors were able to compete free from the restraints that Google imposes via its MADAs, they would become more effective as they processed more queries, and this competition would push Google to improve as well.  Also, if Google's rivals were allowed to compete for default status, they would do so in part by offering to pay device manufacturers for that status on various Android smartphones and tablets.  Google itself is familiar with this practice; in arenas where it cannot impose its MADAs, it has won default search engine status by competing for that position, in part by offering to pay huge sums of money for the privilege.  Such payments to Android OS device manufacturers, maximized by way of competitive bidding, would lower the bottom-line cost associated with production of the covered devices, which in turn would lead to lower consumer prices for smartphones and tablets.[1]

10.    Google's MADAs are contracts in restraint of trade that are designed to maintain and extend Google's monopolies in general search and handheld general search.  Simply put, there is no lawful, pro-competitive reason for Google to condition licenses to pre-load popular Google apps on making its search product the default search engine on covered devices.  By insisting on these contracts with device manufacturers, to the detriment of competition and consumers, Google has violated the Sherman Act, the Clayton Act, California's Cartwright Act, and California's Unfair Competition Act.  Plaintiffs seek an injunction prohibiting Google from forcing its unlawful distribution agreements on device manufacturers, and they seek monetary relief based on the

---

[1] *E.g.*, Peter J. Wilcoxen, *Effect of a Subsidy* (http://wilcoxen.maxwell.insightworks.com/pages/ 1896.html) ("A subsidy generally affects a market by reducing the price paid by buyers . . . ."); Investopedia, *Microeconomics-Effect of Taxes and Subsidies on Supply and Demand* (http://www.investopedia.com/exam-guide/cfa-level-1/microeconomics/tax-effects.asp) (last accessed July 28, 2014) ("If the seller receives the subsidy . . . the equilibrium price decreases.").

quantum of money they overpaid for their Android handheld devices as a result of the competition foreclosed by these contracts.

## II.    JURISDICTION

11.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because plaintiffs allege violations of federal law, namely, the federal Sherman and Clayton Acts. The Court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

12.    This Court has personal jurisdiction over defendant because the defendant is licensed to do business in the state of California and in fact conducts business in this state.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as unlawful practices are alleged to have been committed in this federal judicial district and the defendant resides and regularly conducts business in this district.

14.    Assignment to the San Jose division of this Court is appropriate because the defendant has its headquarters in Mountain View, Santa Clara County, California, which is located in this division of the Northern District of California.  Also, it is believed and therefore alleged that many members of the proposed class reside or do business in the San Jose division of the Northern District of California.

## III.    PARTIES

15.    Plaintiff Gary Feitelson is the owner of an HTC EVO 3D mobile phone purchased in or about July 2011 in Louisville, Kentucky.  This device is an Android OS device believed, and therefore alleged, to be covered by one of the exclusionary Google contracts, *i.e.*, a Google-HTC MADA, described herein.  Mr. Feitelson uses his phone, or has used his phone, *inter alia*, to perform Internet general searches.  He did not know that Google search was set as the default search engine on his phone when he purchased it, nor did he know what that meant.  Likewise, he did not know, and does not know now, if there is a way to change the default search engine powering the Internet browser on his phone.  And if there is in fact a way to change the default search engine on his phone, Mr. Feitelson does not know how to do it.  But for the restraints

alleged herein, Mr. Feitelson's phone would have cost less and had better search capabilities as the result of the competition that would have ensued.

16.     Plaintiff Daniel McKee is the owner of a Samsung Galaxy S III mobile phone purchased in or about July 2012 in Des Moines, Iowa.  This device is an Android OS device believed, and therefore alleged, to be covered by one of the exclusionary Google contracts, *i.e.*, a Google-Samsung MADA, described herein.  Mr. McKee uses his phone, or has used his phone, *inter alia*, to perform Internet general searches.  He did not know that Google search was set as the default search engine on his phone when he purchased it, nor did he know what that meant. Likewise, he did not know, and does not know now, if there is a way to change the default search engine powering the Internet browser on his phone.  And if there is in fact a way to change the default search engine on his phone, Mr. McKee does not know how to do it.  But for the restraints alleged herein, Mr. McKee's phone would have cost less and had better search capabilities as the result of the competition that would have ensued.

17.     Defendant Google is a Delaware corporation with its headquarters and principal place of business in Mountain View, California.  Google is America's leader in general Internet search conducted on all devices, and in handheld general search.  It also is the owner of the Android OS and popular and exclusive mobile and tablet applications including YouTube, Google Maps, and Gmail.  Additionally, Google is the owner of the Google Play (formerly Android Market) client, by which owners of Android devices bearing it are enabled to buy applications, music, movies, and books from the Google Play store.  Google was number 55 on last year's U.S. Fortune 500, with 2013 revenues of $55.2 billion and profits of $10.737 billion.

## IV.     RELEVANT FACTS

18.     The plaintiffs, like many millions of Americans, are consumers of Android OS devices who have been affected adversely by Google's unlawful practices in commerce.

**A.     Google is a monopolist in general search.**

19.     General Internet searches occur, *inter alia*, when a user goes to a search engine website – Google.com, for example – and executes a query there, or when he enters a query into his browser's search bar and a pre-designated search engine operating in the background executes

1    it.  For example, a user might conduct a general Internet search by querying "name of the 32nd

2    president of the United States."

3         20.    Google is a monopolist in the U.S. market for general search conducted on all

4    devices, including laptops, desktops, mobile phones, and tablets.  According to StatCounter,

5    Google's search engine share over all these devices was at 81.87% as of March 2014.

6    (http://gs.statcounter.com/#desktop+mobile+tablet-search_engine-US-monthly-201401-201403

7    (last accessed April 16, 2014).)  Google's share is even larger, factoring in the .71% of the market

8    that AOL held as of April 2014, and the .36% of the market that Ask Jeeves held as of that same

9    time, both of which Google powers.  By contrast, Google's competitor Bing's share was at a

10   distant 9.8% as of that point in time, and its competitor Yahoo!'s share was at an even more distant

11   6.42%.  (*Id.*)  (Yahoo! search is currently powered by Bing.  Bing is owned by Microsoft.)



25        21.    By any standard, Google's 81.87%+ share of the U.S. general search market is a

26   monopoly.

**B.      Google is a monopolist in handheld general search.**

22.      Google also is a monopolist in U.S. market for handheld general search.

23.      Recognizing that Internet search was migrating from desktops to mobile devices, Google purchased the Android OS in August 2005.  Handheld device manufacturers including Samsung Electronics Co., Ltd. ("Samsung"), HTC Corporation ("HTC"), and others have adopted Android as the operating system for their popular smartphone and tablet devices.  These devices have included the popular Samsung Galaxy and HTC EVO smartphone lines, and the Samsung Galaxy and HTC Flyer tablet lines.

24.      With respect to mobile phones, according to comScore, a firm that regularly surveys over 30,000 U.S. mobile subscribers in the U.S., Android's share of the United States smartphone market was at 51.7% as of January 2014.  comScore also reports that as of January 2014, Americans owned 159.8 million smartphones, up 7% from October 2013.  Thus, the Android OS powers the majority of smartphones owned by U.S. users.  But this does not begin to tell the story of Google's dominance in mobile and tablet devices.  That dominance is based in its monopoly in handheld general search.

25.      Handheld general search occurs when a smartphone or tablet user performs an Internet search query on his or her device.  If, for example, the user wants to know where the nearest coffee shop is located, she might type her query into the search bar of her mobile browser.  The browser then will hand off the request to a pre-set search engine, such as the Google search engine, that will operate behind the scenes to execute her request.  Or she might use a dedicated search app, for example a Google-branded app that was pre-loaded onto her phone,[2] and enter her search term there.  Not surprisingly, when she does so with a Google search app, the search is processed through the Google search engine.  Or she might go to https://www.google.com via her

---

[2] As Google is no doubt aware, given its insistence in its MADAs that manufacturers pre-load not just the few Google apps that they might want, but a whole suite of them, pre-loading is not only a highly effective means of making consumers aware of the existence of an app, but also of getting them to use the app.  (*See Preloaded Applications – The Hype and the Reality*, iGR, Inc. White Paper, Sept. 2010, at 5 ("nearly *half* of consumer discover new applications by trying the preloaded applications on their handset compared to 26 percent who visit app stores." (emphasis in original) (https://igr-inc.com/Downloads/?ID=757) (last accessed July 30, 2014).

browser and run the search from there – which is not as likely on a mobile device as the other two methods described, given the extra step involved to navigate to the Google website before entering the desired query. But in that event, too, a search engine – in this example, Google's – will execute the search. Whichever of these methods the phone or tablet user employs, search results will be returned to her.

26.     Google is the dominant mobile and tablet search engine in the United States. As of March 2014, StatCounter reports that Google's U.S. handheld general search engine share – the share of mobile phone and tablet searches run through Google's search engine – was at an astounding *86.82%*. Its competitor Yahoo!'s share was at a distant 7.64%, and its competitor Bing's share was at an even more distant 5.16%. (http://gs.statcounter.com/#mobile+tablet-search_engine-US-monthly-201401-201403-bar (last accessed April 16, 2014).)



27.     The handheld general search market is a submarket of the Internet general search market. The former captures Internet general searches performed on portable, wireless, handheld smartphones and tablets. The latter captures Internet general searches performed not only on these

handheld devices, but on desktop and laptop computers, too.  By any standard, Google's 86.82%

share of the U.S. handheld general search market is a monopoly.

**C.      Google engages in unlawful behavior in order to restrain trade and to maintain and grow its monopoly in the search markets at issue.**

28.      Google maintains monopoly status in handheld general search, which ensures that

the vast majority of mobile and tablet searches will be run by its search engine.  Smartphone and

tablet users have increased dramatically over the past few years and are projected to continue

increasing in the near future.[3]  This increase has outpaced the increase in usage of traditional

computers and laptops.[4]  Moreover, as Google is well aware, capturing the attention of users of

handheld devices is the most effective method of promoting the Google search engine.

29.      Cornering the market on handheld-device searches also translates to colossal profits.

Google makes its money by selling advertising.  The primary component of its advertising profits

is search advertising.  Search advertising, which is a function of Google's AdWords platform,

serves paid ads in conjunction with so-called organic or natural search results.  (*See*, *e.g.*,

http://www.google.com/adwords/?sourceid=awha&subid=us-en-ha-aw-bkup1~46272282725 (last

accessed July 28, 2014).)  Thus, if an individual conducts a search for "flat screen tv" that is run by

Google's search engine, he will be returned not only a series of organic results in the form of links

to responsive websites, but also, he often will be returned a series of advertisements at the top

and/or right (or north and east) of the results page or pages.  These search advertisements are based

on a computerized analysis of the search terms that the individual entered, and paid ads are served

---

[3] Statista, *Number of Smartphone Users in the U.S. from 2010 to 2018* (http://www.statista.com /statistics/201182/forecast-of-smartphone-users-in-the-us/ (last accessed July 28, 2014) (showing increasing number of smartphone users in the U.S.)).

[4] Gartner, *Gartner Says Worldwide PC, Tablet and Mobile Phone Shipments to Grow 4.5 Percent in 2013 as Lower-Priced Devices Drive Growth* (http://www.gartner.com/newsroom/id /2610015 (last accessed July 28, 2014)). For example, "at some moments during the [2012 Olympics], there have been more searches performed on tablets and smartphones than on computers. *Going for Mobile Gold: 10x Increase in Olympics Mobile Searches Globally* (http://googlemobileads.blogspot.com/2012/08/going-for-mobile-gold-10x-increase-in.html (last accessed July 28, 2014)).

as a function of a bidding process that advertisers have undertaken in order to "buy" words in the search query.[5]

30. Search advertising results in billions of dollars of revenue to Google annually. (*See* http://arstechnica.com/tech-policy/2014/01/court-orders-google-to-pay-1-36-of-adwords-revenue-for-infringing-patents/ (estimating that Google's U.S. AdWords revenue, which is based on ads generated by search queries, "is somewhere in the range of $15 billion to $18 billion annually") (last accessed April 30, 2014).) Unfortunately, Google has not competed simply on the basis of a better search engine, but also various unlawful tactics designed to favor its interests. These tactics have caught the attention of Congress and regulators at home and abroad.

**1. Google has been the subject of, and has settled, various antitrust investigations.**

31. In September 2011, the U.S. Senate Subcommittee on Antitrust, Competition Policy and Consumer Rights held a hearing on "The Power of Google: Serving Consumers or Threatening Competition?," at which Google's Executive Chairman, Eric Schmidt, appeared and answered questions related to Google's status as a monopolist; charges that it rigged search results to favor its own interests; and charges that it scraped content from various websites and served it up in non-organic search results, among others. (*See generally* Power of Google Transcript of Sept. 21, 2011 Hearing (http://www.gpo.gov/fdsys/pkg/CHRG-112shrg71471/pdf/CHRG-112shrg71471.pdf (last accessed March 20, 2014)).)

32. Following this hearing, *The New York Times* reported in an October 12, 2012, article entitled "Drafting Antitrust Case, F.T.C. Raises Pressure on Google," that

> [t]he Federal Trade Commission is raising the ante in its antitrust confrontation with Google with the commission staff preparing a recommendation that the government sue the search giant.
>
> The government's escalating pursuit of Google is the most far-reaching antitrust investigation of a corporation since the landmark federal case against Microsoft in the late 1990s. The agency's

---

[5] *See, e.g.*, http://www.google.com/adwords/how-it-works/costs.html?sourceid=awha&subid=us-en-ha-aw-bkup1~46272282725&__utma=173272373.1084255901.1406569706.1406569706.1406569732.2&__utmb=173272373.16.9.1406569883352&__utmc=173272373&__utmx=-&__utmz=173272373.1406569732.2.2.utmcsr=us-en-ha-aw-bkup1~46272282725|utmccn=awha|utmcmd=(not%20set)&__utmv=-&__utmk=47692263 (explaining AdWords basics) (last accessed July 28, 2014).

FIRST AMENDED CLASS
ACTION COMPLAINT

- 11 -

central focus is whether Google manipulates search results to favor
its own products, and makes it harder for competitors and their
products to appear prominently on a results page….

33.     Google ultimately reached a settlement with the U.S. government to head off an

antitrust lawsuit.  (*See*, *e.g.*, "Google Agrees to Change Its Business Practices to Resolve FTC

Competition Concerns in the Markets for Devices Like Smart Phones, Games and Tablets, and in

Online Search" (http://www.ftc.gov/news-events/press-releases/2013/01/google-agrees-change-its-

business-practices-resolve-ftc (last accessed March 26, 2014)).)  In that settlement, Google agreed

to two terms involving search advertising.  According to the Federal Trade Commission, "Google

[]agreed to give online advertisers more flexibility to simultaneously manage ad campaigns on

Google's AdWords platform and on rival ad platforms; and to refrain from misappropriating online

content from so-called "vertical" websites that focus on specific categories such as shopping or

travel for use in its own vertical offerings."  (*Id*. at 1.)

34.     Google also has faced intense scrutiny from the European Union's antitrust

authorities for these same sorts of practices.  In February 2014, the E.U. and Google announced

that they had reached a settlement in avoidance of litigation.  By way of the settlement, Google has

agreed to display rival search ads next to its own specialized search ads.  It also has agreed to allow

website owners the right to opt-out of display of their content crawled by Google's search engine

agents on covered web pages.  And Google has agreed to cease making it difficult or impossible for

advertisers to port search advertising campaigns, *i.e.*, AdWords campaigns, to rival search engines.

(*See Commitments in Case COMP/C-3/39.740*, dated January 31, 2014, at 2-15

(http://services.google.com/fh/files/blogs/google_commitments_full_2014.pdf (last accessed

March 22, 2014).)  But the settlement has yet to attain final approval by the E.U.  Instead, it is

under heavy fire from various quarters, including the E.U.-affiliated European Consumer

Organisation, for not going far enough, and for leaving Google's anti-competitive practices

unchecked.  (*See*, *e.g.*, http://www.eubusiness.com/Members/BEUC/google-antitrust (last accessed

April 4, 2014).)

**2.      Google restrains and injures competition through the use of its Mobile Application Distribution Agreements.**

35.      A manufacturer of an Android OS smartphone or tablet must obtain a license from Google to pre-load onto a particular device popular Google apps including YouTube, the Google Play client, Google Maps for Mobile, Google Calendar, Gmail, and Google Talk, among others. Google exploits this state of affairs to coerce manufacturers into making its search product the default search engine on covered devices.  This practice restrains and damages competition, aids Google in its monopolization of the search markets discussed herein, and adds to Google's already enormous profits from search-related advertising.

36.      Recently revealed copies of Google's contracts with device manufacturers, called MADAs, provide the details of Google's abusive market manipulation.  If a smartphone or tablet manufacturer such as Samsung or HTC wishes, for example, to pre-load Google's popular and exclusive YouTube app on a given Android OS phone or tablet,[6] or if it wishes to install Google's popular and exclusive Google Play client on that device,[7] then Google requires that the

---

[6] Consumers want and expect the YouTube app on their Android OS devices.  In fact, a recent study confirmed that smartphone users prefer to view video with apps such as the YouTube app versus viewing via their browsers (*i.e.*, by browsing to the YouTube website and viewing video there).  ("Study: Do Smartphone Users View Video with YouTube App or Browsers? " dated March 29, 2013 (http://www.brighthand.com/default.sp?newsID=19955 (last accessed July 27, 2014).)

More generally, as Google is no doubt aware, consumers will factor into their purchasing decisions which apps are pre-installed on a given device.  (*See Preloaded Applications – The Hype and the Reality*, iGR, Inc. White Paper, Sept. 2010, at 1 ("More than two-thirds of all [survey] respondents said the pre-installed apps were a factor driving the purchase of their device.") (hyperlink at n.2, *supra*).)

[7] If an Android OS mobile device does not allow access to the Google Play store, many consumers will decline to buy it.  For example, one reviewer confessed that he would not buy Amazon's new Fire Phone – which is not subject to Google's MADAs – in part because it lacked access to the vast library of apps in the Google Play store, given that Amazon's app store "is only a fraction of the size of Google's . . . ."  (*See* Timothy Stenovec, "I Tried Amazon's Fire Phone— Here's Why I Won't Buy It," *Huffington Post*, July 22, 2014 (http://www.huffingtonpost.com/ 2014/07/22/amazon-fire-phone-review_n_5611573.html) (last accessed July 28, 2014).)  If a company with Amazon's great resources cannot build an Android app store that is a viable alternative to the Google Play store, woe be to other device manufacturers that might have a desire to try.

In fact, Google Play competitors face other alleged anti-competitive behavior by Google. Recently a Portuguese firm operating a much smaller app store than Google Play filed an antitrust complaint with the European Commission regarding Google's anticompetitive practices in the app

FIRST AMENDED CLASS
ACTION COMPLAINT                          - 13 -

010437-11  707082 V1

manufacturer must agree to make Google the default search engine on the device.[8]  This

requirement means that no rival search engine can compete for default search engine status on an

affected device because, by definition, there can be only one default search engine.  Also, the

manufacturer also must agree to pre-load *all* of a suite of Google applications onto prime screen

real estate.  Further, the manufacturer must agree to make Google location services the default

location services provider on the phone.  Additionally, the manufacturer must agree that it will pass

a so-called Android Compatibility Test as to that device, which Google administers and controls in

its sole discretion. (Ex. A (MADA between Google and Samsung), ¶¶ 2.1 ("Devices may only be

---

store field.  (*See*, *e.g.*, http://online.wsj.com/articles/google-faces-fresh-antitrust-complaint-in-europe-1402941192 (last accessed July 28, 2014).)  According to *The Wall Street Journal*, "Aptoide claims that Google creates obstacles for users to install third-party app stores onto its Android platform, bundles services that are essential to its operating system with Google, and blocks access to Aptoide websites in its Chrome Web browser." (*Id.*)

[8] Plaintiffs do not yet have sufficient information to identify which other manufacturers beyond Samsung and HTC have, or have had, contracts with Google with these same or substantially similar terms.  But the Joint Submission of Corrected Exhibit List (Dkt. No. 923) submitted in the *Oracle v. Google* matter, lists MADAs between Google and a who's who of Android OS device manufacturers, including LG, Toshiba, Fujitsu, Funai, iriver, GigaByte Tech. Co., JVC Kenwood, NEC Casio MobileComm, NEC Corp., Phillips Electronics Hong Kong, Sony, Acer, ASUSTek Computer, Dell, TCT Mobile, Yulong Computer Telecomm. Scientific, ZTE Corp., and Kyocera. Unfortunately, these MADAs are not available for public inspection because they were not entered into evidence in the case.  It appears likely, however, that Google has insisted on similar tying arrangements with some or all of these other manufacturers, in violation of federal and state law, and to the detriment of competition and consumers. (*See Oracle America, Inc. v. Google Inc.* (N.D. Cal. No. 3:10-cv-03561), Dkt. No. 923 at Entries 83-85, 286, 2742-56, and 2772-93.)

As of December 2012, these manufacturers made up 63.7% of the non-Apple smartphone market in the United States. comScore, *comScore Reports December 2012 U.S. Smartphone Subscriber Market Share* (https://www.comscore.com/Insights/Press-Releases/2013/2/comScore-Reports-December-2012-US-Smartphone-Subscriber-Market-Share (last accessed July 31, 2014)). Samsung and HTC alone combined for 31.2% of all U.S. smartphone devices.  *Id.*  Moreover, other manufacturers such as Motorola and LG make up a large portion of the market.  (LG had 7.1% of the market as of December 2012, *id.*, and Motorola had 14.1% of the market in July 2011, before it was acquired by Google. comScore, *comScore Reports July 2011 U.S. Smartphone Subscriber Market Share* (http://www.comscore.com/Insights/Press-Releases/2011/8/comScore-Reports-July-2011-US-Mobile-Subscriber-Market-Share (last accessed July 31, 2014)).  Because Apple has already agreed to place Google as the default search engine on their devices, *infra*, the only competition that remains occurs on non-Apple devices.  Given that Apple is off the table, Google's MADAs are now especially pernicious because they have foreclosed competition in a substantial part of the market.

FIRST AMENDED CLASS
ACTION COMPLAINT

- 14 -

distributed if all Google Applications[9] (excluding any Optional Google Applications) authorized for distribution in the applicable Territory are pre-installed on the device, unless otherwise approved by Google in writing."), 2.7 ("The license to distribute Google Applications in Section 2.1 is contingent upon the Device becoming an Android Compatible Device."), 3.4 (providing that "Google Phone-top Search must be set as *the default search provider for all search access points on the Device* providing for the prime placement of Google Applications" (emphasis added) and also providing for the prime placement of "Google Applications"), 3.8(c) ("Company shall configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices."); Ex. B (MADA between Google and HTC), ¶¶ 2.1 (same as ¶ 2.1 in Google-Samsung agreement), 2.7 (same as ¶ 2.7 in Google-Samsung agreement), 3.4 (same as ¶ 3.4 in Google-Samsung agreement), 3.8(c) (same as ¶ 3.8(c) in Google-Samsung agreement).)

37.     Google's anti-competitive practice of garnering default search engine status in the foregoing manner is currently under investigation by European Union authorities, following the lodging of a complaint by FairSearch.org, of which Microsoft, Expedia, Tripadvisor, Oracle, and others are members.  (*See*, *e.g.*, "In Europe, New Protest Over Google," *The New York Times*, April 8, 2013; "Google Reaches Settlement in EU Antitrust Probe," *The Wall Street Journal*, February 5, 2014 ("The [European Union] commission is also examining whether Google is abusing its market share for mobile phones running its Android operating system, according to people familiar with the examinations.  Competitors have said the company forces them to install software for Google searches.").)  It appears that the European Union is now turning its attention to the subject matter of this complaint, among other matters.[10]

---

[9] In both the Google-Samsung and Google-HTC MADAs, "Google Applications" is defined as "the Google applications listed below . . . ": "Set-up Wizard, Google Phone-top Search, Gmail, Google Calendar, Google Talk, YouTube, Google Maps for Mobile, Google Street View, Contact Sync, Android Market Client (not products downloaded from Android Market), Google Voice Search, and Network Location Provider."  (Ex. A, ¶ 1.12; Ex. B, ¶ 1.11.)

[10] *See*, *e.g.*, http://europa.eu/rapid/press-release_SPEECH-14-515_en.htm (last accessed July 28, 2014) ("Public policies in digital markets: reflections from competition enforcement" (speech by Joaquan Almunia, Vice President of the European Commission Responsible for Competition Policy, to Chatham House Competition Policy Conference 2014, London, June 30, 2014) ("As I said earlier, the Commission has received quite a number of other complaints about a wide range of Google practices.  The most advanced investigation is related to Android, although no formal

38.     Indeed, on July 30, 2014, Reuters reported that "European regulators are laying the groundwork for a case centered on whether Google abuses the 80 percent market share of its Android mobile operating system to promote services from maps to search." ("European regulators training sights on Google's mobile software," *Reuters*, July 30, 2014 (http://www.reuters.com/article/2014/07/30/us-google-europe-android-insight-idUSKBN0FZ2B2 20140730 (last accessed July 31, 2014).)  According to the article, the European Commission has sent out questionnaires to companies asking "whether there was a requirement set by Google, written or unwritten, that they not pre-install apps, products or services on mobile devices that compete with Google software like its search engine, app store and maps." (*Id.*)  The questionnaires "sent to telecoms operators and handset makers using Android" also inquired as to whether "Google had ever communicated 'that it was not in favor of your undertaking manufacturing, marketing or launching a smart mobile device with your own or a third-party application or service pre-installed or set as default'" (*Id.*)  As Reuters noted, regulatory action could aid handset makers and search rivals. (*Id.* ("Handset makers such as Samsung and LG Electronics may also benefit by being freer to pre-install or [*sic*] alternative online services on devices.  That may in turn grant better shop-window placement to rival services from Microsoft and Yahoo.").)

39.     Google is willing to run afoul of antitrust and unfair competition law because of the importance of default search engine status.  To reiterate, Google monetizes search in large part by selling search-related ads that are displayed when a Google search is executed (and relatedly, Google can earn yet more money when a Google search results in a trip to a website on which it displays ads).  So the more Google searches performed, the better for Google's balance sheet.

---

proceedings have been opened.  We are currently trying to ascertain whether there are unjustified restrictions of competition in this area. . . . ."); "Google's European Antitrust Woes Are Far From Over," *The New York Times*, June 22, 2014 (stating that in a June 11, 2014 letter to his commission colleagues, Mr. Almunia wrote that "'the most advanced investigation'" concerns Android and that the allegations relate in part to "'restrictive conditions in agreements' with phone makers and networks.").

40.     If a Google search app or widget is placed prominently on a handheld device, as in the following example of the Samsung Galaxy S III mobile phone home screen bearing the Google Phone-top Search bar across its middle, Google knows that phone and tablet owners will use it.



Also, most phone and tablet users are unaware of the interaction between their browser – which on this Samsung device would be accessed by pushing the "Internet" icon – and the search engine which happens to be powering it; they simply want information from the World Wide Web. (Using the browser to execute a search is an alternative to typing a search into the Google Phone-top search bar.)  They do not realize that when they initiate a search by typing a query into the search/address box of their mobile web browser – the so-called omnibox – the query is executed via a search engine such as Google.

41.     Google well knows that the effects of setting its search product as the default search engine on computing devices are persistent.  Google's own study showed that where browsers were concerned, few users (presumably after being made aware of what a default search engine is and that there might be some way to choose an alternative) could actually figure out how to change their default search engine to something else.  (See "New Microsoft Browser Raises Google's

Hackles," *The New York Times*, May 1, 2006 (http://www.nytimes.com/2006/05/01/technology/

01google.html?pagewanted=print&_r=0).) Thus, by achieving default search engine status on

millions and millions of Android OS devices by way of its MADAs, Google is guaranteed many

more millions of Google searches. And more and more searches make Google exceedingly happy,

because these searches translate to greater and greater monopoly power and the profits that flow

from it. No wonder Google's Vice-President of Product Management & Marketing was positively

giddy when he contemplated the effect of increasing numbers of consumers using Google search:

"*So more users more information, more information more users, more advertisers more users*, it's

a beautiful thing, lather, rinse, repeat, that's what I do for a living. So that's what someone alluded

to [as] *the engine that can't be stopped*."[11]

42.    As a highly effective means of perpetuating and enhancing this "beautiful thing,"

Google uses its MADAs to restrain and quash competition for default search engine status before it

even can begin. There is no lawful reason to compel manufacturers wishing to pre-load the

YouTube app onto a device, or to enable their customers to access the Google Play store and its 1.2

million apps, to make Google the default search engine on that device as well. These restraints

give Google a de facto exclusive license over search the device's search engine because users

rarely switch their default search engine status. Google's practice is a pure power play designed to

maintain and extend its monopoly in handheld general search, and, thereby, its monopoly in

general search as well.

**3.    Google conceals its MADA restrictions.**

43.    Google has repeatedly, through its employees and websites, made public statements

emphasizing that Google welcomes competition and, as a result, imposes no restrictions on device

manufacturers. Yet Google never addresses or mentions the existence of the highly restrictive

contracts at issue in this case. Google has concealed its MADAs because it is aware that these

restraints run counter to Google's public statements promoting open systems and competition.

---

[11] Source: Jonathan Rosenberg, Google VP of Product Management & Marketing, *Inside the Black Box: Technology & Innovation at Google*, Speech to Claremont McKenna College (emphasis added).

44. For example, Google CEO Eric Schmidt has made statements to Congress suggesting that Google makes no demands of smartphone manufacturers with regard to default search engine status. In a September 2011 hearing titled "Power of Google," Sen. Herbert Kohl asked Mr. Schmidt if "Google demanded that smartphone manufacturers make Google the default search engine as a condition of using the Android operating system." Mr. Schmidt replied, in pertinent part:

> Google does not demand that smartphone manufacturers make Google the default search engine as a condition of using the Android operating system . . . Google respects the freedom of manufacturers to choose which applications should be pre-loaded on Android devices. *Google does not condition access to or use of Android on pre-installation of any Google applications or on making Google the default search engine.* . . .

> Manufacturers can choose to pre-install Google applications on Android devices, but they can also choose to pre-install competing search applications like Yahoo! and Microsoft's Bing. Many Android devices have pre-installed the Microsoft Bing and Yahoo! search applications. No matter which applications come pre-installed, the user can easily download Yahoo!, Microsoft's Bing, and Google applications for free from the Android Market.[12]

Mr. Schmidt's narrowly crafted statement hides the fact that at that very moment, Google was conditioning access to their applications on making Google the default search engine.

45. Other Google executives have also promoted the idea that Google welcomes unrestrained competition. According to former Google Senior Vice President Jonathan Rosenberg, "At Google we believe that open systems win . . . In an open system, a competitive advantage *doesn't derive from locking in customers*, but rather from understanding the fast-moving system better than anyone else and using that knowledge to generate better, more innovative products."[13]

46. According to Google, the only limitation on competition was compatibility. For example, Android OS website describes itself as open source but reminds developers and

---

[12] Power of Google Transcript of Sept. 21, 2011 Hearing at 147-48 (http://www.gpo.gov/fdsys /pkg/CHRG-112shrg71471/pdf/CHRG-112shrg71471.pdf (last accessed July 31, 2014)(emphasis added)).

[13] http://googleblog.blogspot.com/2009/12/meaning-of-open.html (last accessed July 31, 2014) (emphasis added).

FIRST AMENDED CLASS
ACTION COMPLAINT                    - 19 -

010437-11 707082 V1

manufacturers to "ensure your devices are compatible with the Android compatibility definition."[14] Former Senior Vice President Andy Rubin also stated that "[i]f someone wishes to market a device as Android-compatible or include Google applications on the device, we do require the device to conform with some basic compatibility requirements. (After all, it would not be realistic to expect Google applications – or any applications for that matter – to operate flawlessly across incompatible devices)." These statements suggest to the public that compatibility standards are the *only* restraint that Google employs. We now know this is false.

47.     Google has never voluntarily mentioned the MADAs in any public forum—they only became public during the *Oracle v. Google* case.[15] Google sought to conceal the MADAs because, as Google is well aware, such restraints hinder unfettered consumer choice and directly contradict Google's public rhetoric. They also violate antitrust and fair-competition law. Contrary to Mr. Rosenberg, Google's competitive advantage gained via its MADA restraints *is derived by locking in customers*.

**4.     Google further forecloses competition in the markets at issue by entering into exclusive contracts with Apple.**

48.     As part of its strategy to maintain and extend its monopoly in handheld general search, Google also has entered into exclusionary agreements with the largest non-Android phone manufacturer, Apple Inc.[16] ("Apple").

49.     Over the years, Google has paid Apple hundreds of millions of dollars, if not billions of dollars, to act as the default search engine on Apple iPhones, iPads, and iPods. It is estimated that Google will pay Apple over a billion dollars in 2014 to retain this status. (*See*, *e.g.*, http://searchengineland.com/financial-analyst-affirms-googles-1-billion-in-default-search-payments-to-apple-148255 (last accessed April 4, 2014).) This arrangement forecloses competing

---

[14] https://source.android.com/ (last accessed July 31, 2014).

[15] *Oracle America, Inc. v. Google Inc.* (N.D. Cal. No. 3:10-cv-03561).

[16] According to StatCounter, Apple's iOS operating system had a 51.66% share of the U.S. market from April-June 2014, while Android had a 42.36% share of the market for that time period. (http://gs.statcounter.com/#mobile_os-US-monthly-201404-201406-bar (last accessed July 31, 2014).)

FIRST AMENDED CLASS
ACTION COMPLAINT                    - 20 -

010437-11  707082 V1

search engine companies from the best opportunity to break Google's stranglehold on the handheld

general search market and the general search market as well.

50. What is more, this arrangement further entrenches and extends Google's monopoly

power in these search markets because more searches mean not only the opportunity to serve more

lucrative search ads, but also a better search engine that puts Google's competitors at greater and

greater disadvantage as time moves forward. (*See* ¶¶ 59-68, *infra*.)

**5. Achieving default search engine status is by far the most effective and cost-efficient way to distribute search engines.**

51. Google's restraints, exercised through its MADAs, are the most highly effective and

cost-efficient way to distribute its search product and to get consumers to use it. Without paying

Android OS manufacturers for the privilege, Google compels them to pre-load its search product

on covered devices and to give it the unique status as default search engine. Then, these same

manufacturers distribute Google's search product to millions and millions of consumers, who will

use Google search without ever making any conscious choice to use it over competing products.

52. Distributing a search product via this method is by far the more cost-efficient and

effective way for any search engine company to distribute its product. There is no real substitute

for default search engine status, and Google knows it. The lack of a real substitute is why Google

uses its MADAs to compel device manufacturers to grant it default search engine status on millions

of Android OS devices, no matter if the practice violates antitrust and fair-competition law, and

why it has paid Apple and Mozilla well over a billion dollars for that status in their products. (*See*

¶¶ 48-50, 77, *supra*.) It also is why Google itself complained to antitrust enforcers in the U.S. and

Europe when it perceived that Microsoft might be granting default search engine status to itself in

the Internet Explorer 7 search box. (*See* ¶¶ 1-3, *supra*.)

53. One possible alternative channel for distribution of a rival search engine is via a

dedicated search website. Of course, this requires getting users to visit the website and to use the

product. In the past, search engine users regularly logged on to a search engine website before

running their search. To conduct a search on Alta Vista, for example, users visited

http://www.altavista.com. Thus, search engine companies would pour tremendous resources into

advertising and marketing the website itself in order to distribute their product.[17]  These

promotional campaigns would pay off to varying degrees.

54.  The rise of handheld devices has reduced the potential effectiveness of such campaigns because consumers are no longer required to take the extra step of accessing a search engine website before running searches.  Instead, search engines can be prominently displayed on the front page of a smartphone via a search bar widget, as on the Android OS devices here at issue. Now, all the consumer has to do is enter her search terms into the search bar.  And even if the consumer does not run a search through the prominently displayed search bar, she still uses the default search engine without ever making a deliberate choice to do so.  This is because a consumer who types a search into his smartphone browser web address box receives results that come from the device's default search engine.  (*See* ¶ 40, *supra*.)  A search engine that does not power a handheld device is, therefore, at a tremendous disadvantage in the market for handheld general search (and, by extension, general search).

55.  Default search engine status on a handheld device also is a devastatingly effective method of gaining users who search on other computing devices.  This affects the broader market for general search.  Users rely on the default search engine without even being aware of it and grow accustomed to the search experience delivered by that search engine, which causes them to use that same search engine on other devices.  As one commentator has explained:

> If you're skeptical that Google is habit-forming, just try using Bing. In a head-to-head comparison of the efficacy of an incognito search, the products are nearly identical . . . [m]illiseconds matter, but they don't hook users.
>
> Instead, habits are what keep users loyal. If a user is familiar with the Google interface, switching to Bing requires cognitive effort. Though many aspects or Bing are identical to Google, even a slight change in pixel placement forces the would-be convert to learn something new.

---

[17] Jim Hu, "AltaVista Plans Huge Ad Blitz, Relaunch" (http://news.cnet.com/AltaVista-plans-huge-ad-blitz,-relaunch/2100-1040_3-231154.html (last accessed July 31, 2014)).

FIRST AMENDED CLASS
ACTION COMPLAINT                              - 22 -

010437-11  707082 V1

Adapting to the differences in the Bing interface is what actually slows the user down and makes Bing feel inferior.[18]

56.     Another alternative means of distribution that a competitor might try is to convince users to download and use its app.  For example, a Google competitor such as Microsoft might undertake an expensive advertising campaign in an attempt to convince users to download the Bing search application on their smartphones.[19]  But this is no substitute for default search engine status; if it were, Google simply would undertake to convince all Android OS users to download a Google search app rather than risk antitrust violations by compelling manufacturers to deploy its search product as the default on their MADA-covered devices.

57.     Alternatively, a competitor like DuckDuckGo might attempt to convince Android OS device consumers to re-set their default search engines to DuckDuckGo – assuming it is possible to do so on a particular device.  But then the user still must figure out how to access and change the settings to switch the default search engine setting to DuckDuckGo.  Unfortunately, this entire process requires significant effort on the part of the consumer – if the consumer can figure out how to do it at all.  (*See* ¶ 41, *supra*.)  As a result, most users will keep their devices' default search engine status unchanged.

58.     To summarize, a competitor could attempt to distribute its product facing the hurricane-headwinds of its competitor's default search engine status on millions and millions of devices, but to do so, the competitor would have to pour tremendous resources into marketing and advertising to gain a relatively small number of users.[20]  On the other hand, a company that is able

---

[18] Nir Eyal, "Getting Your Product Into the Habit Zone," (http://www.nirandfar.com/2012/09/habit-zone.html (last accessed July 28, 2014)).

[19] *E.g*., Tom Warren, "Microsoft Launches Nationwide 'Bing it on' TV Campaign to Challenge Google," (http://www.theverge.com/2012/9/6/3296562/bing-it-on-microsoft-google-challenge-ads (last accessed July 31, 2014)).

[20] *See, e.g.,* Brian Morrissey, "Microsoft Bing Faces Uphill Battle" (http://www.adweek.com/news/technology/microsofts-bing-faces-uphill-battle-99868 (last accessed Aug. 1, 2014) ("Microsoft's. . . big ad push built strong awareness and motivated user trials but showed little evidence of loosening Google's stranglehold on the market.")).  Despite the fact that Microsoft spent over $100 million on one of its advertising campaigns, Google remains the dominant market leader in general search, with a market share of nearly 82%.  (*See* ¶ 20, *supra*).

FIRST AMENDED CLASS
ACTION COMPLAINT

- 23 -

010437-11  707082 V1

to place its search engine on millions and millions of handheld devices as the default provider – at no cost – has a highly effective and cost-efficient method of distribution that cannot be matched.

**D.      Google's practices with respect to its search product and apps restrain and injure competition in markets where already there are high barriers to entry.**

59.      Google's unlawful practices in aid of its monopoly restrain and injure competition, and stifle innovation,[21] in search markets where already there are high barriers to entry.  In order to be a viable search engine, a market participant must process a high volume of searches so that its search algorithms can become truly viable and improve over time.  The need for a high volume of searches presents one high barrier to market entry.  Also, a market participant must have the resources to build and maintain the physical plant, to program and maintain the requisite software and algorithms, and to perform the web crawling and indexing that makes search possible.  This presents another high barrier to market entry.  Google adds to these barriers by coercing OEMs to make its search engine the default search product on devices covered by its MADAs, which, *inter alia*, denies its competitors volumes of searches whose processing would improve those competitors' search algorithms.  This, in turn, lessens its competitors' effectiveness and consumer appeal going forward, which results in less profits that otherwise would be available to sustain and build upon their presence in the market.

60.      Any search engine becomes better over time as more and more search inquiries are run through it.  Searches executed via Google's search engine provide Google with data that Google utilizes to improve its search algorithm.  For example, if a user's quest for specific information is not satisfied by clicking on prominent links in results returned by the search engine, she will click on a lower-ranked link or enter new search terms, and this data allows the algorithm powering the search engine to adapt, or to be modified, to produce better results.  This, in turn, enhances Google's appeal to consumers, and the cycle repeats itself.  Then, because Google attracts more users with these ever-improving search results, Google attracts yet more ad dollars

---

[21] *E.g.*, Stephen D. Houck, *Injury to Competition/Consumers in High Tech Cases*, St. Johns L. Rev. Vol. 5, Iss. 4, 593, 598 (2001) ("Any assessment of a restraint's anticompetitive impact, however, will be incomplete if limited to price and output effects. The restraint's impact on consumer choice and innovation must also be considered.").

because advertisers will follow the most consumers. And with more advertising dollars, Google can spend even more money to enhance its infrastructure[22] and search product, the effect of which will be to attract yet more. (*See*, *e.g.*, C. Argenton & J. Prüfer, "Search Engine Competition with Network Externalities," *Journal of Competition Law and Economics*, 8(1), 73-105 (2012), at 1-2, 9, 11, 13.) This is the "beautiful thing" of which Mr. Rosenberg, Google VP of Product Management and Marketing, has spoken.

61.     The high barrier to entry posed by Google's "beautiful" cycle has been recognized by antitrust regulators. As the federal government recognized in its February 18, 2010, "Statement of the Department of Justice Antitrust Division on Its Decision To Close Its Investigation of the Internet Search and Paid Search Advertising Agreement Between Microsoft Corporation and Yahoo! Inc.":

> The search and paid search advertising industry is characterized by an unusual relationship between scale and competitive performance. The transaction will enhance Microsoft's competitive performance

---

[22] Huge financial and computational resources are required to run a search engine as a consequence of the enormity of the World Wide Web. Search engines crawl the web via robots in order to index the contents of the nearly *one billion* websites in existence. (*See* http://www.internetlivestats.com/total-number-of-websites/ (last accessed April 14, 2014).) Needless to say, this is a Herculean task due to the ever-expanding nature of the web. Google's head of search stated at an August 2012 search press breakfast that there were some 20 *trillion* URLs online and that Google crawled over 20 *billion* of those on an average day. He also reported that Google answered 100 billion searches per month. (http://searchengineland.com/google-search-press-129925 (last accessed April 22, 2014) (emphasis added).) Contrast this to what Google reported only four years earlier, when the numbers already were staggering. As Google wrote in July 2008: "Recently, even our search engineers stopped in awe about just *how* big the web is these days – when our systems that process links on the web hit a milestone: 1 trillion (as in 1,000,000,000,000) unique URLs on the web at once!" (http://googleblog.blogspot.com/2008/07/we-knew-web-was-big.html (last accessed April 14, 2014) (emphasis in original).) Google reported further:

> Even after removing … exact duplicates, we saw a trillion unique URLs, and the number of individual web pages out there is growing by several billion pages per day.… We don't index every one of those trillion pages … [b]ut we're proud to have the most comprehensive index of any search engine…. Today, Google downloads the web continuously …. [M]ultiple times every day, we do the computational equivalent of fully exploring every intersection of every road in the United States. Except it'd be a map about 50,000 times as big as the U.S., with 50,000 roads and intersections."

(*Id.*)

because it will have access to a larger number of queries, which should accelerate the automated learning of Microsoft's search and paid search algorithms and enhance Microsoft's ability to serve more relevant search results and paid search listings, particularly with respect to rare or 'tail' queries. The increased queries received by the combination operation will further provide Microsoft with a much larger pool of data than it currently has or is likely to obtain without this transaction. The larger data pool may enable more effective testing and thus more rapid innovation of potential new search-related products, changes in the presentation of search results and paid search listings, other changes in the user interface, and changes in the search or paid search algorithms. This enhanced performance, if realized, should exert correspondingly greater competitive pressure in the marketplace.

Yet even after consummation of the Microsoft-Yahoo! deal referenced in this statement by the Department of Justice, in which Microsoft's Bing began to power Yahoo! searches, Bing has struggled mightily. As *The Washington Post* reported recently, Microsoft's "online services division, which oversees search engine Bing, reported a loss of $1.3 billion in 2013 – less than the previous year but still in the red." (http://www.washingtonpost.com/blogs/the-switch/wp/2014/02/05/investors-want-microsofts-new-ceo-to-kill-xbox-bing-and-surface/ (last accessed April 14, 2014.) This has brought pressure from investors to dump Bing altogether.

62. If Microsoft were to exit the market, then there is little hope for *any* meaningful competition in the markets for general search and handheld general search. As Steve Pociask and Joseph P. Fuhr, Jr. of the American Consumer Institute put it in their July 24, 2012 paper entitled "The Search for Market Dominance":

Most troubling, however, are recent events suggesting that rivalry in the search engine and search advertising markets has waned altogether. Not only are many of the early search engine rivals gone, but most of the remaining competitors are using Google's search capability to some extent or through revenue-sharing deals. For example, for years now, AOL has been using Google's search engine and, consequently, Google's advertising program. Similarly, Ask.com downsized its staff several years ago and signed a five-year multi-billion dollar deal to use Google's advertising/sponsored links program. More recently, both AOL and Ask.com have reaffirmed their dependence on Google. As recently as last October, there are reports that Google was looking to finance a deal for others to buyout Yahoo. Bing continues to sustain billions of dollars in losses and single-digit market share worldwide. Google has locked into exclusive deals with various providers, making it the default search engine on many online web devices. By all indications, competitors are waning, rivals are using Google's own services, and not even Microsoft can make a profitable dent into the market. It appears that

the market has tipped to Google, which funnels much of the web's
traffic to and from its websites and partner websites.

(*Id.* at 8-9 (footnotes omitted) (http://www.ftc.gov/sites/default/files/attachments/frequently-requested-records/1311google-2013-00857.pdf) (last accessed April 15, 2014).)

63.     Google itself has acknowledged that scale is critical to the general search market and constitutes a grave barrier to entry.  For example, Google's executive chairman, Eric Schmidt, was quoted in an April 13, 2003 *New York Times* article entitled "In Searching the Web, Google Finds Riches" as stating: "Managing search at our scale is a very serious barrier to entry."  And this was over 10 years ago, well before Google attained its present immense size and scale.  Mr. Schmidt has since tried to walk back that statement, but it remains as objectively true today as it was then – even more so.

64.     In fact, only a few years ago, Mr. Schmidt again acknowledged the immense power and marketplace effectiveness of Google's scale during an interview for an October 9, 2009. *BloombergBusinessweek* article entitled "How Google Plans To Stay Ahead in Search."  In response to the question, "What is Google's biggest strength in search?"  Mr. Schmidt responded: "We just have so much scale in terms of the data we can bring to bear."

65.     This is consistent with Mr. Schmidt's remarks expressed earlier in 2009, in response to a question during a FOX Business television interview about whether Microsoft's investment of some $80-100 million into promotion for its competitive search engine, Bing, would compel a response from Google.  As Mr. Schmidt put it, "From Bing's perspective they have a bunch of new ideas and there are some things that are missing.  We think search is about comprehensiveness, freshness, *scale, and size* for what we do.  *It's difficult for them to copy that.*" (http://www.zdnet.com/blog/btl/schmidt-bing-has-not-changed-what-google-is-doing/19492 (emphasis added) (last visited March 20, 2014).)  When not even a company as successful and wealthy as Microsoft gives Google competitive pause due to Google's scale and the barriers to entry that it poses, then realistically, no company can hope to compete with Google in the fast-growing market for handheld general search, especially when Google resorts to unlawful behavior to maintain and expand its monopoly power.

66.     Indeed, as Reuters reported on November 21, 2012, in an article entitled "Google competitor DuckDuckGo says it's getting shut out," "[u]pstart Internet search engine DuckDuckGo, which promotes itself as a Google Inc. rival which does not track users' personal information, says it is being hurt by the search giant …."  According to the article, Gabriel Weinberg, the MIT graduate who started DuckDuckGo, complained that "the Android wireless phone comes with Google as the phone's standard search mechanism."  (*Id.*)  "DuckDuckGo can be added as an app to a mobile device, which is less convenient than being the default search engine, said Weinberg."  But Google's anti-competitive tactics did not stop there.  Instead, Google, having purchased a company which owned the domain name "duck.com," began redirecting traffic from that domain name to itself after DuckDuckGo inquired about purchasing it.  (*Id.*)  This, according to Mr. Weinberg, created confusion among consumers.  (*Id.*)  Mr. Weinberg also complained of the difficulty of making DuckDuckGo the default search provider in Google's Chrome web browser.  (*Id.*)  The article concluded by reporting that "[a] former antitrust enforcer, who asked not to be named, said the actions that Weinberg complained about were unexciting taken individually but, as a cluster, could be worrisome.  'It's relevant.  It's what antitrust enforcers call monopoly soup,' said the enforcer."  (*Id.*)

67.     When Bing and other search engines such as DuckDuckGo are excluded from competition by way of the practices described in this complaint, not only is actual competition restrained and harmed by way of the exclusion itself,[23] but even the *prospect* of real competition is restrained and diminished.  When Google's search product grows in effectiveness, fueled by search volumes strongly enhanced as a result of Google's anti-competitive practices, competitors fall yet further behind both in terms of effectiveness but also in terms of reputation in the marketplace.

68.     Not only is competition restrained and harmed by Google's practices, but so is the innovation that real competition brings.  When rivals are not able to compete, they will be less and

---

[23] Competition is further restrained and harmed by Google's unlawful contracts because rivals to Google's applications, such as AOL's MapQuest, an alternative to Google Maps, cannot compete for pre-load exclusivity on affected Android OS mobile devices.  Google's like applications must be pre-loaded pursuant to terms of its MADAs, in prime positions on the handheld devices' screens.

FIRST AMENDED CLASS
ACTION COMPLAINT                          - 28 -

less likely to make the investments in time and money that would mean better mobile search or maps (as one example) for everyone. New potential competitors will stay away, too, from such a stacked marketplace. And this means that consumers are robbed of what these aspiring competitors might bring to the market, if only they were given a fair chance to compete.

**E.     Google's unlawful practices harm consumers.**

69.     Consumers are harmed by Google's practices in aid of maintaining and advancing its monopolies in handheld general search and general search because they are robbed of choice, because of the stifling of innovation, and because their handheld devices cost more than they would if Google did not foreclose competition.

       **1.     Google harms consumers by killing competition, stifling innovation, and diminishing consumer choice.**

70.     First, Google's mandatory MADA terms that compel OEMs to make its search product the default search provider when the OEMs wish to pre-load some of its other apps, necessarily kill competition and consumer choice as described throughout this complaint. This state of affairs cries out for correction before Google drives its remaining competitors completely out of the markets for handheld general, and general, search. As Susan A. Creighton, counsel for Google and former Director of the Bureau of Competition at the Federal Trade Commission, put it at the Power of Google hearing: "And this really gets to the question of, are there impediments to the ability of consumers to choose. So if someone found, for example, that as Microsoft did there [with respect to Netscape], that Microsoft was intimidating OEMs from being able to offer rival product so that it never got to market, then I would want to have relief that went to those provisions that were preventing choice." (Power of Google Transcript of Sept. 21, 2011 Hearing at 46-47 (http://www.gpo.gov/fdsys/pkg/CHRG-112shrg71471/pdf/CHRG-112shrg71471.pdf (last accessed March 20, 2014)).[24])

---

[24] Google's counsel also remarked that competition among search engines for default status with Apple was a good thing – even as Google's own MADAs make it impossible with respect to affected Android OS products. (*See id.* at 45 ("[W]e actually want Apple to be able to have companies like Bing and Google competing to be the best search     engine. . . . Now, [Apple] having picked Google, Bing and Yahoo are going to compete that much harder the next time. So

**2.    Google harms consumers by causing supra-competitive pricing of affected Android OS devices.**

71.    Second, when Google's competitors in handheld general search are prevented from competing with regard to default engine status, or for app exclusivity, on a phone or tablet, money they would pay manufacturers for that status – which would drive down the price of that device – stays in these competitors' pockets.  The expected contest for default search engine status never occurs, so maximized payments to OEMs do not occur, such that the bottom line to affected devices cannot be subsidized by these payments.  This means that consumers pay more for affected phones and tablets than they would but for Google's unlawful behavior.

72.    This effect on consumer prices is not mere speculation.  Not only does standard economic theory support this conclusion, *see* n.1, *supra*, but so, for example, do observations of the market for personal computers.  As with Windows-based personal computers, there is a race to the bottom price-wise for Android devices.  *See*, *e.g.*, "Race to the bottom: how are Google and OEMs going to cope with commoditization?" (http://www.androidauthority.com/google-oem-cope-commodization-403372/ (describing the race to lower prices as the only viable means of differentiation among very similar Android devices) (last accessed July 28, 2014).  Still, while the average sales price for Android phones has dropped from $441 in 2010 to a projected $254 in 2014, *see id.*, the price would fall yet further with any funds available to manufacturers to apply to the bottom line.

73.    Falling consumer prices is what has happened in the PC market by way of the money, *i.e.*, subsidies, that software producers pay PC manufacturers to pre-load their software onto the manufacturers' devices.  As a June 20, 2012 *Houston Chronicle* article entitled "PC makers brought Microsoft's Surface upon themselves," explains:

> For years, Microsoft has complained to the companies that make Windows PCs about the overall experience those hardware manufacturers are delivering to their customers. Companies like Dell, HP, Sony, Lenovo, Acer and others license Windows as the

when you have that kind of a contestable market, that you have someone who's a stand-in for consumers, because Apple is not going to take the worst search engine.").)

operating system, then add software touches to make the notebooks and desktops unique.

These original equipment manufacturers, or OEMs, also charge *other software developers to place their programs on the hard drive.* These are often trial versions that must be purchased before they'll work as intended, or they're "lite" editions that lack features available in the full, paid release.

*By taking money in exchange for placement of software on these computers, the OEMs can charge less for their products, essentially subsidizing part of the cost for the buyer. That's a big reason why Windows PCs cost less than those made by Apple, which does not sell real estate for third-party software on its hard drives.*

(*Id.* (emphasis added).) Google's MADAs foreclose analogous price-lowering subsidies to consumer prices for Android OS mobile devices. Discovery and expert analysis will tell the tale of the dollars that U.S. consumers have overpaid for affected devices.

## V. INTERSTATE TRADE AND COMMERCE

74. The activities of the defendant as alleged in this complaint were within the flow of, and substantially affected, interstate commerce.

## VI. RELEVANT MARKETS

### A. Plaintiffs' allegations involve two relevant markets.

75. Where it is necessary that plaintiffs demonstrate the existence of relevant markets, there are two. The first is the United States market for general search, *i.e.*, general Internet search conducted on desktop computers, laptops, and handheld devices via the Google search engine or one of its general search engine rivals, such as Bing. The second is the United States market for handheld general search, *i.e.*, general Internet search conducted on smartphones and tablets.

#### 1. General search

76. *First*, Google has acknowledged the existence of a "general search" category (*see id.* at 72 and 102 (referring to Microsoft's Bing search engine in a written response posed by a U.S. Senator in the "Power of Google" proceedings, Google's counsel remarked: "Here, by comparison, Google has no ability to exclude a *general search engine rival such as Microsoft* from the market."; and its executive chairman stated in response to another written question: "As I

FIRST AMENDED CLASS
ACTION COMPLAINT                                    - 31 -

010437-11  707082 V1

acknowledged during the Committee hearing, Google is 'in the area' of 65% of queries [for desktop search] in the U.S., if you look only at Google's *general search competitors*, such as Microsoft's Bing and Yahoo!") (emphases added).)

77.     Though Google today seems intent on denying the existence of this obvious market – even as it (a) pays Apple hundreds of millions, if not billions, of dollars for default search engine status on Apple i-devices[25]; (b) pays Mozilla hundreds of millions of dollars, and perhaps more than $1 billion over time, for default search engine status in the Firefox web browser[26]; and (c) insists on unlawful arrangements with Android OS manufacturers to maintain and expand its dominance of general search in smartphones and tablets – Google's executive chairman was correct when in September 2010 he remarked in a *Wall Street Journal* video interview that there is in fact a market for general search.  Whatever Google's current efforts to dilute the discreteness of this market with references to specialized searches run through Facebook, for example, or Yelp, its executive chairman himself rightly waved away such efforts from others only a short while ago. As AFP reported in a September 25, 2010, article entitled "Google chief sees Bing as main threat":

> Google chief executive Eric Schmidt on Friday said that Microsoft's Bing search engine was the company's main threat, not Facebook or Apple.
>
> "While it's true Web search is not the only game in town, *searching information is what it is all about*," Schmidt said in Wall Street Journal interview video posted online.
>
> He described Apple as a well-respected competitor and Facebook as a "company of consequence doing an excellent job in social networking," but said that Microsoft's latest-generation search engine was Google's main competition.

---

[25] Google has paid Apple hundreds of millions of dollars, if not billions of dollars over the years, to act as the default search engine on Apple iPhones, iPads, and iPods.  It is estimated that it will pay Apple over a billion dollars in 2014 to retain this status.  (*See*, *e.g.*, http://searchengineland.com/financial-analyst-affirms-googles-1-billion-in-default-search-payments-to-apple-148255 (last accessed April 4, 2014).)

[26] *See*, *e.g.*, http://allthingsd.com/20111222/google-will-pay-mozilla-almost-300m-per-year-in-search-deal-besting-microsoft-and-yahoo/) (discussing Google-Mozilla deal whereby Google agreed to pay Mozilla just under $300 million per year to be the default choice in Mozilla's Firefox browser, a huge jump from its previous arrangement, due to competing interest from both Yahoo and Microsoft," which illustrates the competition that can occur in the absence of restraints imposed by Google's MADAs) (last accessed July 28, 2014).

FIRST AMENDED CLASS
ACTION COMPLAINT

010437-11  707082 V1

"We consider neither to be a competitive threat," Schmidt said, referring to Facebook and Apple. "*Absolutely, our competitor is Bing*. Bing is a well-run, highly competitive *search engine*."

(http://www.google.com/hostednews/afp/article/ALeqM5gJL1jBNwMhcjiDZl-

P1EVe8Lalpw?hl=en (last accessed March 22, 2014 (emphasis added).)

### 2.  Handheld general search

78.    *Second*, a relevant submarket, in addition to, or as an alternative to, the first relevant market, is the United States market for handheld general search.  Not only do industry analysts consider handheld general search to be a distinct market, but so does Google in its pitches to advertisers.  (*See*, *e.g.*, http://services.google.com/fh/files/misc/mobile-search-ppt.pdf (PowerPoint presentation to advertisers based on Google-Nielsen survey and study).)

### B.    The injuries that plaintiffs have suffered are inextricably intertwined with the general search and handheld general search markets.

79.    Plaintiffs allege injury to themselves and consumers who have purchased and used devices covered by Google's MADAs, but they need not demonstrate the existence of, or define, a separate handheld device market.   The antitrust injuries, including the harm to competition, that Google has caused (and is continuing to cause) in the search markets are achieved by way of the use of plaintiffs' mobile devices, just as Google intended.

80.    Google's restraints directly impact the handheld search market.  Handheld general search includes all searches made on handheld devices.  Consumers run searches using the default search engine as Google intended, and they are unlikely, for various reasons described herein, to switch the default search engine to one of Google's competitors.

81.    Google's restraints also directly impact the general search market.  First, the handheld general search market is a submarket of the general search market, so effects there impact the greater market.  Second, general searches also are conducted on non-handheld computing devices, including desktop computers, laptops, notebooks, tablets, and smartphones.  As consumers become increasingly comfortable with Google's search experience on their handheld devices, consumers will develop habits that make them unlikely to use competing search engines on all their

FIRST AMENDED CLASS
ACTION COMPLAINT                                     - 33 -

010437-11  707082 V1

computing devices.  So the effects of Google's restraints are multiplicative and directly affect the general search market in this way, too.

82.     Affecting user behavior on handheld devices is therefore integral and necessary to the success of Google's MADAs.  And because forcing OEMs that want some of its apps to set Google search as the default product causes higher phone prices, the MADAs exert a direct impact on the handheld device market.  These higher prices are harmful to consumers, and they are a direct result of Google's anti-competitive scheme to force users to use and rely on Google search.

## VII.    CLASS ALLEGATIONS

83.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(1), (2), and (3).

84.     Plaintiffs bring this action on behalf of themselves and the following class, for injunctive relief based on violations of the federal Sherman and Clayton antitrust acts:

> All U.S. purchasers of any Android OS mobile telephone or tablet as to which Google and the manufacturer of such device have entered into a contract or contracts, including the so-called Mobile Application Distribution Agreement, by which Google has conditioned the right to pre-load any application from a suite of Google applications, including the YouTube app or the Google Play client, on the manufacturer's mandatory acceptance and installation of Google search, or so-called Google Phone-top Search, as the default search engine on that device.

Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

85.     Plaintiffs also bring this action on behalf of themselves and the following class, for monetary and injunctive relief based on violations of California's Cartwright Act and Unfair Competition Law:

> All U.S. purchasers of any Android OS mobile telephone or tablet as to which Google and the manufacturer of such device have entered into a contract or contracts, including the so-called Mobile Application Distribution Agreement, by which Google has conditioned the right to pre-load any application from a suite of Google applications, including the YouTube app or the Google Play client, on the manufacturer's mandatory acceptance and installation of Google search, or so-called Google Phone-top Search, as the default search engine on that device.

FIRST AMENDED CLASS
ACTION COMPLAINT                          - 34 -

Excluded from this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

86.     Upon information and belief, the unlawful conduct alleged in this complaint, including preparation of, imposition of the terms of, and entry into, the Google MADAs, was effected, implemented, adopted, and ratified in the state of California, where Google maintains its U.S. headquarters.  Furthermore, a substantial part of the anti-competitive conduct took place in California.  For these reasons, plaintiffs allege that they and the nationwide class proposed in the preceding paragraph are entitled to monetary and injunctive relief under California law.

87.     In the event that the Court determines that California law does not apply nationwide, plaintiffs will bring alternative, additional class allegations based on the laws of the various states permitting such actions under their antitrust and unfair competition laws.

88.     **Numerosity:**  The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but upon information and belief, the classes will consist of many hundreds of thousands of members, or even millions of members, such that individual joinder in this case is impracticable.

89.     **Commonality:**  Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes.  These include, but are not limited to:

a.     Whether Google unlawfully has conditioned the contractual right of any manufacturer of any Android OS mobile telephone or tablet to pre-load on that device any of Google's applications, including the YouTube app or the Google Play client, on the manufacturer's mandatory acceptance and installation of Google search, or so-called Google Phone-top Search, as the default search engine on that device;

b.     Whether there are U.S. antitrust markets for general search and handheld general search;

FIRST AMENDED CLASS
ACTION COMPLAINT                                    - 35 -

010437-11  707082 V1

c.      Whether Google has unlawfully monopolized, or attempted to monopolize, the markets for general search and handheld general search, including with respect to Android OS mobile telephones and tablets;

d.      Whether competition in the general search and handheld general search markets has been restrained and harmed by Google's monopolization of those markets;

e.      Whether consumers have been harmed, including by way of having paid more for their affected Android OS mobile telephones and tablets than they would have but for Google's unlawful conduct, as a result of Google's unlawful practices;

f.      Whether plaintiffs and members of the proposed classes are entitled to declaratory or injunctive relief to halt Google's unlawful practices, and to their attorney fees, costs, and expenses;

g.      Whether plaintiffs and members of the proposed classes  are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and

h.      Whether plaintiffs and members of the proposed classes are otherwise entitled to any damages or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

90.      **Typicality:**  Plaintiffs' claims are typical of the claims of the members of the proposed classes.  The factual and legal bases of Google's liability are the same and resulted in injury to plaintiffs and all of the other members of the proposed classes.

91.      **Adequate representation:**  Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately.  They have retained counsel competent and experienced in complex class-action litigation.  Plaintiffs have no interests that are antagonistic to those of the proposed classes, and their interests do not conflict with the interests of the proposed class members they seek to represent.

92.      **Prevention of inconsistent or varying adjudications:**  If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results.  This would have the effect of establishing incompatible standards

FIRST AMENDED CLASS
ACTION COMPLAINT

- 36 -

010437-11  707082 V1

of conduct for the defendant. Certification of plaintiffs' proposed classes would prevent these undesirable outcomes.

93. **Injunctive and declaratory relief:** By way of its conduct described in this complaint, the defendant has acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

94. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## VIII. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1)

95. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

96. Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide Sherman Act and Clayton Act class (hereafter "federal law class") described above.

97. Under the MADAs described herein, manufacturers of Android OS smartphones and tablets wishing to pre-load onto a device any Google application contained in a Google-designated suite of apps must agree to pre-load *all* Google applications from that suite onto that device. This suite of apps includes not only the YouTube app and Google Play client, among others, but Google's Phone-top Search, *i.e.*, Google's search engine product, as well. Thus, a manufacturer wishing to pre-load YouTube or Google Play onto a device also is required to pre-

FIRST AMENDED CLASS
ACTION COMPLAINT                                        - 37 -

install Google Phone-top Search on that device and to make it the default search engine "for all Web search access points on the Device." (Exs. A and B, ¶ 3.4.) These requirements mean, *inter alia*, that no rival search engine can compete for default search engine status on an affected device because, by definition, there can be only one default search engine.

98.     Google's MADAs are contracts in restraint of trade. Google's conduct affects and forecloses a substantial amount of interstate commerce.

99.     Plaintiffs and the federal law class have been harmed by Google's conduct. First, they have been harmed in terms of the denial of choice and other injuries to competition and innovation as alleged herein. Second, they have been harmed in terms of the supra-competitive prices they paid for their smartphones and tablets due to the inability of Google's rivals to compete for default search engine status or exclusive application pre-loading, including by way of paying device manufacturers fees for such status. Had Google's rivals been able to compete for such status on a given device, including by way of making payments to device manufacturers, the effect would have been to lower the cost to produce that device, and consumer prices would have been lower than what they were but for Google's unlawful conduct. For these reasons, Google's conduct has been a substantial factor in causing plaintiffs' and the proposed classes' harm.

100.     Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store. Plaintiffs and the federal law class are entitled to an injunction, pursuant to 15 U.S.C. § 26, to prevent Google from persisting in its unlawful behavior to their detriment.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION
### (15 U.S.C. § 2)

101.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

102.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide federal law class described above.

103.     The relevant markets are the U.S. general search market and the handheld general search market.

FIRST AMENDED CLASS
ACTION COMPLAINT

- 38 -

010437-11  707082 V1

104.    Google possesses monopoly power in the relevant markets.

105.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant markets.

106.    Google has the power to exclude competition in the relevant markets, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to maintain and expand its monopoly power in both.

107.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. markets for handheld general search and general search.

108.    Google has combined with device manufacturers to maintain and grow its monopoly in handheld general search and general search, with the effect being that competition is foreclosed, that innovation is stifled, and that consumer choice is gravely diminished.

109.    There is no business necessity or other pro-competitive justification for Google's conduct.

110.    Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for their affected Android OS smartphones and tablets.

111.    Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store.  Plaintiffs and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION
### (15 U.S.C. § 2)

112.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

113.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide federal law class described above.

114.    Google has attempted to monopolize the U.S. market for general search and the U.S. market for handheld general search.

115.    Google's anti-competitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for general search and the U.S. market for handheld general search.

116.    Google has a specific intent to achieve monopoly power in the U.S. market for general search and the U.S. market for handheld general search.

117.    Google has the power to exclude competition in the U.S. market for general search and the U.S. market for handheld general search, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize those relevant markets.

118.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. markets for general search and handheld general search.

119.    Google has combined with device manufacturers in an attempt to monopolize handheld general search and general search, with the effect being that competition is foreclosed, that innovation is stifled, and that consumer choice is gravely diminished.

120.    There is no business necessity or other pro-competitive justification for Google's conduct.

121.    Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for their affected Android OS smartphones and tablets.

122.    Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store.  Plaintiffs and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

FIRST AMENDED CLASS
ACTION COMPLAINT                           - 40 -

010437-11  707082 V1

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE CLAYTON ACT**
**(15 U.S.C. § 14)**

123.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

124.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide federal law class described above.

125.    Under the MADAs described herein, manufacturers of Android OS smartphones and tablets wishing to pre-load onto a device any Google application contained in a Google-designated suite of apps must agree to pre-load *all* Google applications from that suite onto that device.  This suite of apps includes not only the YouTube app and Google Play client, among others, but Google's Phone-top Search, *i.e.*, Google's search engine product, as well.  Thus, a manufacturer wishing to pre-load YouTube or Google Play onto a device also is required to pre-install Google Phone-top Search on that device and to make it the default search engine "for all Web search access points on the Device."  (Exs. A and B, ¶ 3.4.)  These requirements mean, *inter alia*, that no rival search engine can compete for default search engine status on an affected device because, by definition, there can be only one default search engine.

126.    Google's MADAs are designed to lessen competition substantially and tend to create, or maintain and expand, Google's monopoly in the U.S. markets for general search and handheld general search.

127.    Plaintiffs and the federal law class have been harmed by Google's conduct.  First, they have been harmed in terms of the denial of choice and other injuries to competition and innovation as alleged herein.  Second, they have been harmed in terms of the supra-competitive prices they paid for their smartphones and tablets due to the inability of Google's rivals to compete for default search engine status or exclusive application pre-loading, including by way of paying device manufacturers fees for such status.  Had Google's rivals been able to compete for such status on a given device, including by way of making payments to device manufacturer, the effect would have been to lower the cost to produce that device, and consumer prices would have been lower than what they were but for Google's unlawful conduct.  For these reasons, Google's conduct has been a substantial factor in causing plaintiffs' and the federal law class's harm.

FIRST AMENDED CLASS
ACTION COMPLAINT

- 41 -

010437-11  707082 V1

128.    Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store. Plaintiffs and the federal law class are entitled to an injunction, pursuant to 15 U.S.C. § 26, to prevent Google from persisting in its unlawful behavior to their detriment.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE CARTWRIGHT ACT**
**(CAL. BUS. & PROF. CODE § 16727)**

129.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

130.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide California law class described above (hereafter "California law class"). Alternatively, if the Court does not apply California law on a nationwide basis, plaintiffs bring this claim on their own behalf and on behalf of each member of a California class.

131.    Under the MADAs described herein, manufacturers of Android OS smartphones and tablets wishing to pre-load onto a device any Google application contained in a Google-designated suite of apps must agree to pre-load *all* Google applications from that suite onto that device. This suite of apps includes not only the YouTube app and Google Play client, among others, but Google's Phone-top Search, *i.e.*, Google's search engine product, as well. Thus, a manufacturer wishing to pre-load YouTube or Google Play onto a device also is required to pre-install Google Phone-top Search on that device and to make it the default search engine "for all Web search access points on the Device." (Exs. A and B, ¶ 3.4.) These requirements mean, *inter alia*, that no rival search engine can compete for default search engine status on an affected device because, by definition, there can be only one default search engine.

132.    Google's MADAs are designed to lessen competition substantially and tend to create, or maintain and expand, Google's monopoly in the U.S. markets for handheld general search and general search.

133.    Plaintiffs and the California law class (or, alternatively, plaintiffs and a California class) have been harmed by Google's conduct. First, they have been harmed in terms of the denial of choice and other injuries to competition and innovation as alleged herein. Second, they have

FIRST AMENDED CLASS
ACTION COMPLAINT

- 42 -

been harmed in terms of the supra-competitive prices they paid for their smartphones and tablets due to the inability of Google's rivals to compete for default search engine status or exclusive application pre-loading, including by way of paying device manufacturers fees for such status. Had Google's rivals been able to compete for such status on a given device, including by way of making payments to device manufacturer, the effect would have been to lower the cost to produce that device, and consumer prices would have been lower than what they were but for Google's unlawful conduct.  For these reasons, Google's conduct has been a substantial factor in causing plaintiffs' and the proposed classes' harm.

134.   Plaintiffs are inclined to purchase Android OS devices in the future, in part because of their investment in learning the Android OS system and also because of their desire to continue using applications they have purchased from the Android Market or Google Play store.  Plaintiffs and the California law class (or, alternatively, plaintiffs and a California class) are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

135.   Plaintiffs and the California law class (or, alternatively, plaintiffs and a California class) also are entitled to treble damages based on the monetary injuries caused to them by Google's unlawful conduct, including overpayment for their mobile phones and tablets.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF THE UNFAIR COMPETITION ACT**
(CAL. BUS. & PROF. CODE §§ 17200, *et seq.*)

136.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

137.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide California law class described above.  Alternatively, if the Court does not apply California law on a nationwide basis, plaintiffs bring this claim on their own behalf and on behalf of each member of a California class.

138.   California's Unfair Competition Law ("UCL") defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice.  CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

139.   Google has engaged in, and, upon information and belief, continues to engage in, acts of unfair competition as defined in California's UCL.  These acts of unfair competition include

FIRST AMENDED CLASS
ACTION COMPLAINT                              - 43 -

010437-11  707082 V1

1    its violations of the federal Sherman and Clayton Acts, as well as California's Cartwright Act, as

2    alleged herein.

3            140.    Google's conduct has harmed competition and consumers.  Consumers have

4    overpaid for their affected Android OS mobile phones and tablets due to the inability of Google's

5    rivals to compete for default search engine status or exclusive application pre-loading, including by

6    way of paying device manufacturers fees for such status.  Had Google's rivals been able to

7    compete for such status on a given device, including by way of making payments to device

8    manufacturer, the effect would have been to lower the cost to produce that device, and consumer

9    prices would have been lower than what they were but for Google's unlawful conduct.

10           141.    Plaintiffs are inclined to purchase Android OS devices in the future, in part because

11   of their investment in learning the Android OS system and also because of their desire to continue

12   using applications they have purchased from the Android Market or Google Play store.  Plaintiffs

13   and the California law class (or, alternatively, plaintiffs and a California class) are entitled to an

14   injunction to prevent Google from persisting in its unlawful behavior to their detriment.

15                                      **PRAYER FOR RELIEF**

16           WHEREFORE, plaintiffs respectfully request the following relief:

17           A.      That the Court certify this case as a class action; that it certify the proposed federal

18   law class, and the proposed California law class, on the nationwide bases requested; and that it

19   appoint them as class representatives and their counsel as class counsel;

20           B.      That the Court award them and the proposed classes all appropriate relief, including,

21   but not limited to, injunctive relief requiring that Google cease the practices effected by its

22   MADAs as described herein, and declaratory relief, adjudging such practices unlawful, as well as

23   monetary relief, whether by way of restitution or damages, including treble, multiple, or punitive

24   restitution or damages where mandated by law or otherwise available, as well as recovery of their

25   attorneys' fees, costs, and expenses;

26           C.      That the Court grant such additional orders or judgments as may be necessary to

27   prevent the unlawful practices complained of herein; and

28

FIRST AMENDED CLASS
ACTION COMPLAINT                          - 44 -

010437-11  707082 V1

D.      That the Court award them and proposed classes such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  August 1, 2014                    HAGENS BERMAN SOBOL SHAPIRO LLP


By _____/s/ Steve W. Berman_____
                    Steve W. Berman
Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com
robl@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Classes*