1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BOTTINI & BOTTINI, INC.
Anne B. Beste (SBN 326881)
  abeste@bottinilaw.com
Albert Y. Chang (SBN 296065)
  achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
  ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002

*Attorneys for Plaintiff and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN RE GOOGLE PLAY CONSUMER
ANTITRUST LITIGATION

Case No. 3:20-cv-05761-JD

**Declaration of Albert Y. Chang in
Support of Administrative Motion
to Consider Whether Cases Should
be Related Pursuant to Civil L.R.
3-12**

Declaration of Albert Y. Chang                                    Case No. 3:20-cv-05761-JD

Under 28 U.S.C. § 1746, I, Albert Y. Chang, state as follows:

1.      I am an attorney at Bottini & Bottini, Inc., counsel for Plaintiff Amos Kober.  I respectfully submit this declaration in support of Plaintiff Amos Kober's Administrative Motion to Consider Whether Cases Should be Related Pursuant to Civil L.R. 3-12.  I have personal knowledge of the matters set forth herein and could and would testify competently thereto if called upon to do so.

2.      A stipulation pursuant to Civil L.R. 7-11, 7-12 for Plaintiff's Administrative Motion to Consider Whether Cases Should be Related could not be obtained because, after conferring with counsel for defendants, I could not obtain their consent to the relief sought in this motion.

3.      Attached as **Exhibit A** is a true and correct copy of the complaint filed in *Kober v. Google LLC, et al.*, No. 5:20-cv-08336 (Santa Clara Cnty. Super. Ct. filed November 25, 2020).

I declare under the penalty of perjury that the foregoing is true and correct. Executed in La Jolla, California, on December 10, 2020.

s/ Albert Y. Chang
Albert Y. Chang

**1**

Declaration of Albert Y. Chang                                                   Case No. 3:20-cv-05761-JD

# EXHIBIT A

# EXHIBIT A

E-FILED
10/27/2020 6:59 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV372225
Reviewed By: R. Walker

BOTTINI & BOTTINI, INC.
Anne B. Beste (SBN 326881)
 abeste@bottinilaw.com
Albert Y. Chang (SBN 296065)
 achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
 ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Attorneys for Plaintiff and the Class*

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

AMOS KOBER, on behalf of himself
and all others similarly situated,

                        Plaintiff,

        v.

GOOGLE LLC, ALPHABET, INC.,
and DOES 1-100,

                        Defendants.

Case No. **20CV372225**

**CLASS ACTION COMPLAINT:**

**(1) THE CARTWRIGHT ACT
(CAL. BUS. & PROF. CODE §
16720);**

**(2) UNFAIR COMPETITION
LAW (CAL. BUS. & PROF.
CODE § 17200 *ET SEQ.*); AND**

**(3) UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated (the "Class," as defined below), files this class-action complaint against Google LLC and Alphabet, Inc. ("Defendants") for violations of the Cartwright Act and Cal. Bus. & Prof. Code.  Plaintiff alleges the following (a) upon personal knowledge with respect to the matters pertaining to Plaintiff; and (b) upon information and belief with respect to all other matters, based upon, among other things, the investigations undertaken by Plaintiff's counsel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

# I.   INTRODUCTION

1.     Google has become synonymous with its search engine, Google Search. Google's search engine is a tool so ubiquitous and well-recognized that it has even become a verb.  The success of this tool has made Google one of only four companies in the world with a market capitalization exceeding $1 trillion.  Its annual revenue exceeds $160 billion.

2.     However, Google's success has been achieved at the expense of the very essence of the free market system: competition. To become the behemoth it is today, Google engaged in a litany of anticompetitive activity to establish and maintain monopolies in the markets for general search services and search advertising.

3.     General search services are programs and tools that allow internet users to locate and find specific information on the internet and predominantly take the form of search engines, such as Google Search. These general search engines are accessed by consumers using "search access points," such as web browsers or other software applications, that are primarily distributed on their smartphones, tablets, desktop computers, and laptops.

4.     To maintain its status as the preeminent search engine in the world, Google has managed to establish Google Search as the default search engine on the most widely distributed electronic devices, such as mobile phones, tablets, laptops, and computers.

CLASS ACTION COMPLAINT

Given that device owners rarely change default search settings on such products, Google successfully became, and remains, the de facto search engine for most internet users. Google achieved further exclusivity for Google Search by entering into exclusionary agreements and engaging in other anticompetitive conduct to gain control of distribution channels and prevent competition from rivals.

5.     To facilitate this, Google entered into deals with major distributors, such as device manufacturers, U.S. cellular carriers, and website browser developers. By paying these entities billions of dollars each year, Google not only secured default status for its own search engine, but specifically prohibited these distributors from dealing with Google's competitors. Moreover, these agreements often required distributors to accept a bundle of Google apps and prominently display them in locations in the user interface where consumers were most likely to initiate internet searches. Using these agreements, Google enjoys 60 percent of all general search queries performed.

6.     However, Google's maintenance and control of the general search market does not stop there. Almost half of the remaining queries are funneled through a Google owned-and-operated property, such as Google Chrome. As a result of these exploitative tactics, Google controls nearly 80 percent of the search distribution channels.

7.     These actions have insidious effects beyond simply increasing Google's stranglehold over general search services, as they actively eliminate or harm competition as well. Industry rivals are shut out from critical distribution channels, unable to scale, and fail to develop the kind of product or brand recognition possessed by Google.

8.     Furthermore, Google monetizes its predominance in the search engine market using the search advertising market. Due to Google Search's vast user base and enormous scale, Google possesses an unparalleled supply of search advertising. This, when coupled with Google's superior ability to aggregate and collect data on consumers and their search queries and consumers themselves, provides Google with control of the world's most valuable supply of search advertising space and the tools advertisers need to

CLASS ACTION COMPLAINT

create demand for their goods and services. Consequently, Google has established a monopoly in the search advertising market.

9.     Using the massive revenues derived from its unfair competition, Google has also entered into revenue sharing agreements with manufacturers of mobile phones, tablets, laptops, and computers, thereby further solidifying its position in the general search services market. Through these agreements, Google deters distributors from deprioritizing Google Search on their devices or platforms. Moreover, these payments operate to prevent competitors from challenging Google's primacy, as many companies are unable to offer comparable advertising revenue shares.

10.     As a result, advertisers are denied meaningful alternatives to Google Search and thus must pay whatever price Google deems fit. Accordingly, Plaintiff and the Class have experienced a reduction in the quality of general search, lessening choice in general search services, and negative impacts on innovation due to Google's unfair competition.

11.     Plaintiff brings this case to recover damages caused to California consumers.

## II.     JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over Google because it has committed the acts complained of herein in this State and in this County, and is headquartered in Santa Clara, California.

13.     This Court has personal jurisdiction over Google for the additional reason that it has engaged in systematic and continuous contacts with this State and this County by, *inter alia*, regularly conducting and soliciting business in this State and this County, and deriving substantial revenue from products and/or services provided to persons in this State and this County.

14.     Venue is proper in this Court because the conduct at issue took place and has effect in this County, and because Defendants reside in this County.

/ / /

/ / /

4

CLASS ACTION COMPLAINT

III.   **THE PARTIES**

A.   **Plaintiff**

15.   Plaintiff Amos Kober is a citizen of California.   During the class period, Plaintiff has owned a Samsung phone and has suffered damages and harm due to Google's anti-competitive conduct and violations of the Cartwright Act.

B.   **Defendants**

16.   Defendant Google LLC is a corporation which is registered with the California Secretary of State to conduct business in California.   Google is headquartered at 1600 Amphitheatre Parkway in Mountain View, California.

17.   Defendant Alphabet, Inc. is a publicly-traded corporation headquartered in Santa Clara County, and is the parent company of Google LLC.

18.   Google LLC and Alphabet, Inc. are collectively referred to herein as "Google."



Source: http://www.fubiz.net/2013/08/01/google-monopoly/

19.   **Doe Defendants**.   Various other individuals, partnerships, corporations, and other business entities, unknown to Plaintiff, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.   Because the

CLASS ACTION COMPLAINT

true names and capacities of these defendants are unknown to Plaintiff, Plaintiff sues these defendants as Doe Defendants 1-100.  Plaintiff will amend the complaint to show the true names and capacities of these defendants when they have been ascertained.

20.     Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as here alleged were proximately caused by conduct of these fictitiously-named defendants.  Among other things, the Doe Defendants knew or consciously disregarded the unlawful conduct and provided active assistance to the other defendants in carrying out the conspiracy.

## IV.    AGENTS AND CO-CONSPIRATORS

21.     Various other individuals, partnerships, corporations, and other business entities, unknown to the Plaintiff, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  Plaintiff reserves the right to name some or all of these persons and others as Defendants later.

22.     The acts charged in this complaint have been done by Defendants or were ordered or done by Defendants' officers, agents, employees, or representatives, while actively engaged in the management of Defendants' affairs.

23.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

24.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiff is alleging that one or more employees or agents of the entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and

CLASS ACTION COMPLAINT

discussions did not distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed the alkylate products discussed in this Complaint, these subsidiaries played a significant role in the alleged conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

## V.   FACTUAL ALLEGATIONS

### A.   Google

25.   Google was launched in 1998 as a general online search engine that served users' web results in response to online queries. Today, Google's search index contains hundreds of billions of webpages and is well over 100,000,000 gigabytes in size. Google's key innovation was its PageRank algorithm, which ranked the relevance of a webpage by assessing how many other webpages linked to it. PageRank enabled Google to improve the quality of its search results even as the web rapidly grew in contrast with the technology used by rival search engines. While Google had entered a crowded field, it had become the world's largest search engine by 2000. Google launched AdWords, an online advertising service that let businesses purchase keywords advertising to appear on Google's search results page — an offering that would evolve to become the heart of Google's business model — later that year.

26.   Maintaining Google Search is a complex and expensive process given the vastness of the internet and its constantly evolving nature. To develop a general search index of this scale today, as well as viable search algorithms, would require an upfront investment of billions of dollars -- a reality many companies are unable to afford.

7

CLASS ACTION COMPLAINT

27.    Google is now ubiquitous across the digital economy, serving as the infrastructure for core products and services online. It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself. Google is now also the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital mapping, email, cloud computing, and voice assistant services, alongside dozens of other offerings. Nine of Google's products — Android, Chrome, Gmail, Google Search, Google Drive, Google Maps, Google Photos, Google Play Store, and YouTube — have more than a billion users each. Each of these services provides Google with a trove of user data, reinforcing its dominance across markets and driving greater monetization through online ads.

28.    Google is now one of the world's largest corporations. For 2019, Google reported total revenues of $160.7 billion -- up 45 percent from 2017 -- and more than $33 billion in net income. Although Google has diversified its offerings, it generates most of its money through digital ads, which accounted for over 83 percent of Google's revenues in 2019. Search advertising is critical to Google, accounting for approximately 61 percent of its total sales. Google has enjoyed strong and steady profits, with profit margins greater than 20 percent for nine out of the last 10 years, close to three times larger than the average for a U.S. firm. Financial analysts predict that Google is well positioned to maintain its dominance, noting that "Alphabet has established unusually deep competitive moats around its business."

29.    Consequently, Google has simultaneously established parallel monopolies in the general search services and search advertising markets, which mutually sustain each other. This reciprocal relationship is critical, as Google's search advertising monopoly cannot be sustained without its monopolization of the general search services market, and *vice versa*. Most of Google's revenues are derived from search advertising.

/ / /

CLASS ACTION COMPLAINT

1

2

### B.    Industry Background

#### 1.  Search Engines

3

4

5

6

7

8

9

30.    Most modern general search engines use software to "crawl" the internet, indexing webpages and the information within them. As Google explains, "The web is like an ever-growing library with billions of books and no central filing system. We use software known as web crawlers to discover publicly available webpages. Crawlers look at webpages and follow links on those pages, much like you would if you were browsing content on the web. They go from link to link and bring data about those webpages back to Google's servers."

10

11

12

13

14

31.    Using algorithms, search engines evaluate the information on webpages across the internet and return the most relevant results to a user based on the parameters of the initial query. These results are displayed on a Search Engine Results Pages ("SERP"), which includes a short description of each individual result and a link thereto. In addition to these results, the SERP generally includes advertisements as well.

15

16

17

18

19

32.    Most search engines serve as a single platform from which a user can search the internet for answers to a vast range of queries. In the United States, only three general search engines are available for this purpose: Google, Bing, and the privacy-focused search provider DuckDuckGo. Although Yahoo! also serves a general search engine, it purchases search results from Bing instead of searching the internet itself.

20

21

22

23

24

33.    A search engine's effectiveness is largely driven by its scale. Greater scale improves the quality of a general search engine's algorithms, expands the audience reach of a search advertising business, and generates greater revenue and profits. The additional data from scale also allows improved automated learning for algorithms to deliver more relevant results.

25

26

27

34.    Additionally, scale allows a search engine to recoup the enormous financial investment necessary to create and maintain a general search engine. This is particularly true as it relates to search advertising. Greater scale enables a search engine provider to

28

CLASS ACTION COMPLAINT

better discern which ads are most relevant for which queries, in turn leading advertisers to pay more to buy ads from a search provider with a large audience of potentially interested customers and search engine providers.

### 2. Search Advertising

35.    Most general search engines do not charge a cash price to consumers. When using Google, however, consumers provide personal information and a captive audience in exchange for search results. Google then monetizes this by selling ads. To maximize its profits and increase the number of clicks on advertisements, Google ranks ads to promote those with greater relevance and therefore higher expected click-through rates. To help determine placement of ads, Google uses a "quality score" based on various factors.

36.    Search advertising is a technique that allows advertisers to place online advertisements directly into a user's search engine results. By doing so, the advertisement appears as one of the first results a user sees upon using a search engine, such as Google.

37.    These results are displayed to match keywords in a user's search query but are distinct from the "organic results" generated by a search engine's search algorithm. While a search engine algorithm is programmed to produce the most accurate result in response to a search by the user, a search advertisement is displayed as the result of an advertiser having purchased that space through an auction. In this way, search advertisements can be characterized as the "supply" a search engine sells to advertisers.

38.    For example, a furniture company can purchase search advertising on a search engine like Google that will appear when a user searches for the word "couch." The search results will display the search advertisements first followed by the organic results. A particular search advertisement will only appear, however, if the platform conducting the auction accepted the accompanying bid.

/ / /

/ / /

CLASS ACTION COMPLAINT

39.     Search ads enable advertisers to target potential customers based on keywords entered by these users, at the exact moment users express interest in the topic of the queries. For this reason, search ads are placed closer to the consumer's ultimate intent to make a purchase other than types of ads that are primarily intended to drive brand awareness. The ability of search ads to provide advertising based on a consumer's self-disclosed interests, when the consumer is actively seeking information, makes search ads uniquely valuable to advertisers.

40.     In 2000, Google launched AdWords, which allowed advertisers to pay for keyword-based ads that would appear to the right of Google's search results. In the years since, Google has changed the display of the ads on its search engine results page in several ways, most notably by (1) increasing the number of ads placed above organic search results, and (2) blurring the distinction between how ads and organic listings are presented on Google's search results page. These changes have effectively raised the price that businesses must pay to access users through Google. Google's conduct has undermined competition, misled consumers, and degraded the overall quality of Google's search results — all while enabling Google to further exploit its monopoly over general online search.

### C.     The Distribution of General Search Engines

41.     Distribution of a general search engine is a critical aspect of whether it will be used by a device owner. Distribution of general search engines takes place primarily through search access points, such as browsers and search apps, often found on mobile devices and computers.

42.     To ensure a search engine reaches the largest number of potential consumers, general search service providers can enter into agreements with various distributors to secure preset default status on computer and mobile-device search access points. This is effective because new computers and new mobile devices generally come with several preinstalled apps and out-of-the-box settings. As a result, a company like

CLASS ACTION COMPLAINT

Google, using its monopoly power, can enable Google Search as the default general search engine on a range of devices and web browsers.

43.   Mobile devices are one of the most important distribution channels for general search engines, as nearly 60 percent of searches are conducted thereon. The two primary operating systems on mobile devices are Android and Apple's iOS. Apple's iOS is a closed ecosystem, meaning it does not license the operating system to third-party mobile-device manufacturers. Conversely, Android is an open-source mobile operating system controlled by Google, meaning third-party mobile-device manufacturers can use it as the operating system for their devices. By making Android open-source, Google is able to further exert its control over manufacturers that use it as an operating system. Together, Android and iOS operating systems account for almost the entirety of mobile device usage in the United States.

44.   General search services can be delivered to device users through a variety of search access points, including: (1) a browser, (2) a static search bar on the device's home screen, (3) a search app, (4) artificial intelligence software (*e.g*., voice assistants like Siri) accessed by a button or voice command and designed to answer voice-initiated queries, and (5) other apps that link to general search engines, such as smart keyboards.

45.   To establish its primacy, Google has successfully negotiated distribution or licensing agreements with cell phone manufacturers and carriers to establish Google Search as the default general search engine on many mobile and tablet devices. As a result, Google has preset default status for an overwhelming share of the search access points on mobile and tablet devices sold in the United States.

46.   Significantly, Google has reached such an agreement with Apple, whereby Google Search is the default for Apple's Safari browser and other search access points on Apple's mobile and tablet devices. Thus, whenever consumers purchase one of Apple's ubiquitous devices, Google Search is their default general search provider.

CLASS ACTION COMPLAINT

47.     Google's dominance in this area is best represented by looking at mobile browsers. On mobile devices, Apple Safari and Google Chrome account for approximately 55 percent and 35 percent, respectively, of consumer browser usage on mobile devices in the United States. As a result, Google Search is by default the general search engine used by 90 percent of mobile users.

48.     This default status is particularly important because device owners rarely change their mobile device's default settings. Indeed, as Google acknowledged in a 2018 strategy document, "People are much less likely to change [the] default search engine on mobile." Consequently, offering alternative methods of obtaining search access points or encouraging usage of other general search engine are unlikely to counteract the preinstallation of search access points on mobile devices and computers.

49.     On a computer, consumers generally access a general search engine through a browser, either by typing a query directly into the address bar at the top of the browser or visiting a general search engine web page and entering a query.

50.     In the United States, Google Chrome is the leading computer browser, with almost 60 percent market share. Apple's Safari browser has approximately 16 percent share on computers. Mozilla's Firefox has approximately 7 percent share, and Microsoft's Edge and Internet Explorer together have approximately 15 percent share. Other small browsers have a combined share of less than 4 percent.

51.     Except for Microsoft, most browser developers have agreed with Google to preset its search engine as the default search provider. And much like with mobile and tablet devices, consumers rarely have the impetus to change default settings on their browsers. Therefore, Google Search is the preset default general search engine for most consumers browsing the internet on a computer, thus allowing Google to reach more users and scale at a faster rate than it could absent this advantage.

/ / /

/ / /

CLASS ACTION COMPLAINT

1

2

**D.     Google Possesses Monopoly Power in the Search Advertising Market**

**1.  Google's Share of the Search Advertising Market**

3

4

5

6

7

8

9

10

52.     Today, the search advertising business in the United States accounts for over $50 billion per year. Google dominates this industry due to its user base and enormous scale, as advertisers seek to have their marketing campaigns reach the largest number of consumers possible. Based on public estimates of total search advertising spending in the United States, Google's share of the U.S. search advertising market is over 70 percent. This market share understates Google's market power in search advertising because many search advertising competitors offer only specialized search ads and thus compete with Google only in a limited portion of the market.

11

12

13

14

53.     Google also has monopoly power in the general search text advertising market. Google's market share of the U.S. general search text advertising market also exceeds 70 percent. Google's share of the general search text advertising market well exceeds its share of the search advertising market.

15

16

**2.  New Participants Are Foreclosed from the Search Advertising Market Due to Significant Barriers to Entry**

17

18

19

54.     Google can maintain its lead in search advertising due to high entry barriers. Critically, the barriers to entry to the general search services market inherently serve as barriers to entry to the search advertising market.

20

21

22

23

24

25

26

27

55.     Search advertising of any kind requires a search engine with sufficient scale to make advertising an efficient proposition for businesses. Specialized search engines require significant investment, including the cost of populating and indexing relevant data, distribution, developing and maintaining a search algorithm, and attracting users. Search advertising of any kind also requires (1) a user interface through which advertisers can buy ads, (2) software to facilitate the sales process, and (3) a sales and technical support staff.

28

CLASS ACTION COMPLAINT

56.     Moreover, the creation, maintenance, and growth of a general search engine requires a significant capital investment, highly complex technology, access to effective distribution, and adequate scale. Scale is particularly critical, as it affects a general search engine's ability to deliver a quality search experience. The scale needed to successfully compete today is greater than ever, and Google's anticompetitive conduct effectively eliminates rivals' ability to build the scale necessary to compete.

57.     Google is also able to exploit this advantage to generate significant revenues from its search advertising business. Google then shares these revenues with distributors in return for commitments to favor Google Search on their devices and platforms. As a result, a continuous and self-reinforcing monopoly is established: internet users continue to use Google Search rather than a competing search engine, further driving Google's attractiveness to advertisers, thus leading to higher advertising revenues for Google.

### 3.  Google Precludes Existing Competitors from Increasing Output

58.     Google's control of search access points ensures that Google Search is the primary, if not the default, search engine on the most widely used devices. In so doing, Google ensures that its product is used more frequently and is more widespread than that of its competitors. As a result, rivals are less visible and utilized less often, thus denying them opportunities to market or scale a competing search engine. In turn, this vastly restricts an advertisers' available alternatives.

59.     Similarly, Google's anticompetitive agreements foreclose the channels through which a competitor could distribute a competing search engine. These exclusionary agreements not only restrict device manufacturers from creating and distributing devices with competing search engines, but also disincentivizes them from pursuing innovative alternatives or working with Google's rivals. Thus, by shutting competitors out of the general search services market, Google is effectively able to deny any potential competitor the necessary scale to be a financially viable alternative for advertisers.

15

CLASS ACTION COMPLAINT

### 4. Google's Practices Have Led to an Absence of Available Substitutes

60.     A user's general search query has the important function to an advertiser of revealing the searcher's intent. The ability of search ads to respond to consumer inquiries, at the precise moment the consumer investigates a subject relevant to an advertiser's product or service, makes these ads immensely valuable to advertisers and sets them apart from other types of advertising.

61.     Consequently, other forms of advertising are not reasonably substitutable for search ads. For example, "offline" ads such as newspaper, billboard, TV, and radio ads cannot be targeted at a specific consumer based on the consumer's real-time, self-disclosed interests. Similarly, other forms of online ads, such as display ads or social media ads, do not enable advertisers to target customers based on specific queries and are generally aimed at consumers who are further from the point of purchase.

62.     Therefore, few advertisers would find alternative sources a suitable substitute for search advertising. Thus, there are no reasonable substitutes for search advertising, and a search advertising monopolist would be able to maintain prices above the level that would prevail in a competitive market.

### E. Google Engages in Predatory, Exclusionary Agreements to Maintain Its Monopolistic Control Over the Search Advertising Market

66.     In the United States, roughly 60 percent of all search queries are covered by Google's exclusionary agreements. On mobile devices, Google's exclusionary agreements cover more than 80 percent of all U.S. search queries. Of the remaining search queries not covered by Google's exclusionary contracts, almost half take place on search access points owned by Google. These anticompetitive agreements, or variations of them, have allowed Google to corner the market and lock the various distributors of general search engines into using Google Search or other Google apps.

CLASS ACTION COMPLAINT

67.    By foreclosing competition from search rivals, Google simultaneously harms advertisers. Google's predatory agreements ensure that its search engine is not only the predominant search engine in the general search services industry, but in the search advertising market as well. These agreements are essential to Google's monopolies.

### 1.  Anti-Fragmentation Agreements

68.    Although the Android operating system is open source, meaning that anyone can access the source code and use it to make their own, Google takes steps to minimize the risk that a developer creates an Android fork to compete with the Android ecosystem.

69.    One critical way Google accomplishes this is through anti-forking agreements that broadly prohibit manufacturers from taking any actions that may cause or result in the fragmentation of Android. Although fragmentation is an undefined concept, these anti-forking agreements generally forbid manufacturers from developing or distributing versions of Android that do not comply with Google-created and -controlled technical standards.

70.    Google is known to enter into two types of anti-forking agreements with distributors: Anti-Fragmentation Agreements and Android Compatibility Commitments. Although the latter is considered less onerous than the former, both prohibit signatories from manufacturing Android forks of their own, distributing devices with Android forks, or using their powerful brands to market forks on behalf of third parties.

71.    These agreements have expanded beyond just a manufacturers' ability to build and distribute innovative versions of mobile phones. Google has also extended them so that such specifications apply to tablets and emerging technologies such as smart TVs, watches, and automotive devices. Consequently, manufacturers must comply with Google's standards if they want to release Android-based versions of these products.

/ / /

/ / /

CLASS ACTION COMPLAINT

1

### 2.   Licensing and Distribution Agreements

2    72.   One reason device manufacturers agree to anti-forking agreements is that

3    they are a precondition to receiving a license to distribute devices with must-have

4    proprietary Google apps and application program interfaces ("APIs") (the set of technical

5    specifications that enable software applications to communicate with each other,

6    operating systems, and hardware). Over time, Google has chosen to include important

7    features and functionality in Google's own ecosystem of proprietary apps and APIs,

8    rather than the open-source Android code.

9    73.   Google maintains three types of distribution agreements. First, Google

10   requires device manufacturers using the Android operating system that want to preinstall

11   Google's proprietary apps to sign an anti-forking agreement; these agreements set strict

12   limits on the manufacturers' ability to sell Android devices that do not comply with

13   Google's technical and design standards.

14   74.   Second, for device manufacturers using the Android operating system that

15   sign an anti-forking agreement, Google provides access to its vital proprietary apps and

16   APIs for preinstallation, but only if the manufacturers contractually agree to (1) take a

17   bundle of other Google apps, (2) make certain apps undeletable, and (3) give Google the

18   most valuable and important real estate on the default home screen.

19   75.   Third, Google provides a share of its search advertising revenue to device

20   manufacturers using the Android operating system, mobile phone carriers, competing

21   browsers, and Apple; in exchange, Google becomes the preset default general search

22   engine for the most important search access points on a computer or mobile device.

23   ### 3.   Revenue Sharing Agreements

24   76.   Revenue sharing agreements are another critical type of agreement that

25   allows Google to maintain its monopolistic control over multiple markets. Google has

26   revenue sharing agreements with various device manufacturers that use the Android

27   operating system and Apple.

28

CLASS ACTION COMPLAINT

77.    In exchange for requiring exclusive distribution, Google shares a percentage of the revenue it derives from search advertising. Critically, however, Google only shares revenues with Android manufacturers that sign preinstallation agreements for Google apps and APIs and with mobile carriers that have devices built with those same manufacturers. Thus, major U.S. mobile carriers like Verizon, AT&T, and T-Mobile, as well as manufacturers like Samsung, have all signed such agreements.

78.    Google has entered into revenue sharing agreements with rival browsers and other device manufacturers, further blocking off search access points from competition. Most lucratively, Google has entered into a series of search distribution agreements with Apple. This is critical because Apple controls both the software and hardware for its products. This means that it alone controls the preinstallation of the apps on its products, as well as for Safari, Apple's default web browser. Access to these products, and status as their default search engine, is critical given that Apple devices account for roughly 60 percent of mobile device usage in the United States and Mac OS accounts for approximately 25 percent of the computer usage in the United States. Today, Google's distribution agreement with Apple gives Google the coveted, preset default position on all significant search access points for Apple computers and mobile devices.

79.    Additionally, Google has reached similar agreements with major web browser providers such as Mozilla's Firefox, Opera, and UCWeb, which generally require that Google serve as the preset default general search engine for each search access point on both their web and mobile versions.

### 4.    Mobile Incentive Agreements

80.    More recently, Google has replaced its revenue sharing agreements with certain Android manufacturers with mobile incentive agreements. Under these deals, Google pays manufacturers to forego preinstalling rival general search services on their Android devices and to comply with a significant number of incentive implementation

CLASS ACTION COMPLAINT

requirements, such as preloading up to fourteen additional Google apps. LG and Motorola have mobile incentive agreements with Google.

81.    To maximize their payments under such deals, manufacturers must set Google Search as the default for all search access points on nearly all of their devices. Google also retains sole discretion to determine what constitutes a "search access point," and thus controls the coverage of its exclusive contracts. Today, Google has either revenue sharing or mobile incentive agreements with all major U.S. carriers, device manufacturers using the Android operating system, and Apple, in addition to many smaller carriers and manufacturers.

## F.  Google's Acquisition of Competitors Has Caused it to Constrict the Search Advertising Market and Maintain a Monopoly Thereover

82.    According to the House of Representatives' report titled "Investigation of Competition in Digital Markets," Google has systematically and proactively acquired competitors in the search engine services and search advertising markets.

83.    This includes the acquisition of such general search services companies as Synergyse in 2016, Vision Factory in 2014, Cuban Council in 2012, Dealmap in 2011, Aardvark in 2010, Orion in 2006, Akwan Information Technologies in 2005, and Android in 2005.

84.    This also includes the acquisition of such advertising companies as Red Hot Labs in 2015, mDialog in 2014, Adometry in 2014, Spider.io in 2014, Apture in 2011, Admeld in 2011, Invite Media in 2010, AdMob in 2009, Teracent in 2009, Begun in 2008, DoubleClick in 2007, Adscape in 2007, Measure Map in 2006, dMarc Broadcasting in 2006, and Sprinks in 2003.

85.    By removing competitors in one of these markets, Google could decrease the number of competitors in the field and ensure that rival products never threatened Google's offerings. This allowed Google to continually increase its dominance without fear of serious competition and establish its primacy in the market.

20

CLASS ACTION COMPLAINT

86.    With that primacy in place, Google could then leverage its monopolies against one another. In so doing, Google has ascended to a position in both the general search services and search advertising markets that make competition with Google an unviable financial prospect. As a result, Google's monopolies remain unchallenged and advertisers are left to bear the cost.

## G.    Government Investigations

87.    For years Google has been the subject of antitrust investigations and enforcement actions around the world. From 2011 to 2013, the Federal Trade Commission ("FTC") investigated Google's role in search and advertising markets, culminating in a staff recommendation to file a complaint against Google — although the FTC ultimately decided not to do so. At various points over the last decade, Mississippi, Missouri, and Texas have each separately investigated Google for antitrust violations, and, in September 2019, attorneys general from 50 U.S. states and territories announced that they were opening a fresh antitrust inquiry into the search and advertising giant. The Department of Justice ("DOJ") has also been investigating Google since the summer of 2019. These ongoing U.S. investigations follow multiple antitrust inquiries worldwide, as well as antitrust-related penalties levied on Google by the European Commission, France, India, and Russia.

88.    Internationally, antitrust enforcers are also currently investigating Google's dominance in digital advertising, including the United Kingdom's Competition and Markets Authority ("CMA") and the Australian Competition and Consumer Commission. In July 2020, the CMA concluded that Google has "significant market power" in search advertising and its market power had enabled it to charge prices 30-40 percent higher than those set by its competitor, Bing. In September 2020, the Senate Judiciary Committee held a hearing on the effects of Google's dominance in digital ads, where members expressed bipartisan concern that Google's market power across the ad tech stack was enabling anticompetitive conduct and harming publishers and advertisers alike.

CLASS ACTION COMPLAINT

**VI.   ANTITRUST INJURY**

89.   Google's anticompetitive practices in the general search services market has allowed it to illegally dominate and monopolize the search advertising market. By eliminating competition from rival search engines, Google has harmed advertisers by reducing the number of commercially viable search engines on which to place ads. As a result, advertisers are beholden to Google and are effectively required to pay a toll to enter the Google search advertising monopoly.

90.   Google's monopolistic tactics have had the following effects, among others:

(a) Suppressing competition such that Google can manipulate the quantity of ad inventory and auction dynamics which allows it to charge advertisers more than it could in a competitive market; and

(b) Reducing the quality of services provided to advertisers as a result of a lack of meaningful market alternatives, particularly by restricting the information offered to advertisers about their marketing campaigns.

91.   By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having been denied viable market alternatives to Google Search and paid higher prices to buy products and services than they would have paid in the absence of Google's monopolization of the search advertising market, and as a result have suffered damages. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**VII.   MARKET DEFINITION**

92.   Google has monopoly power in the United States search advertising market.

93.   The search advertising market consists of all types of ads generated in response to online search queries, including general search text ads (offered by general search engines such as Google and Bing) and other, specialized search ads, that appear on a search engine results page.

CLASS ACTION COMPLAINT

1

**VIII.  CLASS ALLEGATIONS**

2

3

94.    Plaintiff brings this action both on behalf of Plaintiff and as a class action pursuant to C.C.P. § 382, on behalf of the following class:

4

5

6

7

8

> All persons and entities in the State of California that made payment to Google for a mobile app on the Google Play Store, subscription fees for a mobile app obtained on the Google Play Store, or app content from a mobile app downloaded from the Google App Store, from at least as early as January 1, 2016 through the present ("Class Period").

9

10

11

12

13

14

15

95.    This definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; and (e) the judges and chambers staff in this case, as well as any members of their immediate families. Plaintiff reserves the right to expand, modify, or alter the class definition in response to information learned during discovery.

16

17

96.    This action is properly brought as a class action under C.C.P. § 382 for the following reasons:

18

19

20

21

22

23

a. **Numerosity:** The proposed Class is so numerous and geographically dispersed throughout California that the joinder of all Class Members is impracticable. While Plaintiff does not know the exact number and identity of all Class Members, Plaintiff is informed and believes that there are hundreds of thousands of Class Members. The precise number of Class Members can be ascertained through discovery;

24

25

26

27

b. **Commonality and Predominance:** There are questions of law and fact common to the proposed class which predominate over any questions that may affect particular Class Members. Such common questions of law and fact include, but are not limited to:

28

CLASS ACTION COMPLAINT

i.   Whether Defendants monopolized or attempted to monopolize trade in the relevant markets at any time during the Class Period;

ii.  The identity of the participants of the alleged conspiracy;

iii. The duration of the wrongful acts carried out by the Defendants and their co-conspirators in furtherance of the wrongful conduct;

iv.  Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages;

v.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief;

vi.  Whether the alleged wrongful conduct violated California's antitrust and unfair competition laws;

vii. Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Class, thereby entitling Plaintiff and the members of the Class to disgorgement of all benefits derived by Defendants; and

viii. Whether the Defendants and their co-conspirators fraudulently concealed the wrongful conduct from Plaintiff and the members of the Class.

c.  **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed Class. Plaintiff and the Class have been injured by the same wrongful practices of Defendants. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of the Class and are based on the same legal theories; and

24

d. **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of the Class in that he has no interests antagonistic to those of the other members of the Class, and Plaintiff has retained attorneys experienced in antitrust class actions and complex litigation as counsel.

97.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b. This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured;

c. Without a class action, Class Members will suffer damages, and Defendants' violations of law will proceed without remedy while Defendants reaped and retained the substantial proceeds of their wrongful conduct; and

d. Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

98.     Plaintiff intends to provide notice to the proposed class by communicating the existence of the action in popular trade publications in the industry, utilizing online advertisements, and using professional notice companies to strategically and comprehensively develop additional methods to reach class members.

/ / /

/ / /

CLASS ACTION COMPLAINT

## IX.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Plaintiff's Delayed Discovery Tolled the Statute of Limitations

99.    Plaintiff and class members had no knowledge of Defendants' wrongful conduct, or of facts sufficient to place them on inquiry notice of the claims set forth herein until the DOJ filed a complaint against Defendants on October 20, 2020.

100.    Plaintiff and Class members purchased apps from Google or through the Google Play Store at prices that were artificially inflated as a result of Defendants' wrongful conduct. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy.

101.    Throughout the Class Period, and until October 20, 2020, no information in the public domain was available to Plaintiff and Class members that revealed sufficient information to suggest that any of the Defendants was involved in an unlawful scheme to monopolize the relevant market or engage in conduct prohibited by California law.

102.    It was reasonable for Plaintiff and Class members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior.

103.    Plaintiff alleges a continuing course of unlawful conduct by and among Defendants, including conduct within the applicable limitations' periods. That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

104.    For these reasons, the statutes of limitations applicable to Plaintiff's and Class members' claims have been tolled with respect to the claims asserted herein.

### B.    Defendants' Fraudulent Concealment Tolled the Statute of Limitations

105.    Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiff's claims. Plaintiff and Class members had no knowledge of the combination or conspiracy alleged in this complaint, or of facts sufficient to place them on inquiry notice of their claims, until October 20,

CLASS ACTION COMPLAINT

2020 when the DOJ filed a complaint against Defendants. No information in the public domain or otherwise available to Plaintiff and the Class during the Class Period suggested that Defendants were involved in an unlawful scheme in violation of the antitrust laws.

106.   Defendants concealed their scheme and failed to make any disclosure about their unlawful conduct.  Defendants' scheme also was inherently self-concealing because, as Defendants knew, its disclosure would have led to governmental enforcement activity or civil liability. Google's business practices are subject to antitrust and unfair competition law regulation, so it was reasonable for Plaintiff and Class members to presume that Google was operating in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect that Google's services were being sold at supra-competitive prices at any time during the Class Period.

107. Because Defendants' scheme was self-concealing and affirmatively concealed by Defendants, Plaintiff and Class members had no knowledge of the conspiracy or of any facts or information that would have caused a reasonably diligent person to suspect a conspiracy existed during the Class Period.

108.   Moreover, Defendants took steps to affirmatively conceal their illicit activities. After it was revealed the DOJ was focusing on Google's monopoly in advertisement technology and online search, Google responded by directing the public to a blog post in which it described competition in the digital advertising industry as "flourishing" and asserted that "publishers and marketers have enormous choice."

109.   In 2019, the French Competition Authority fined Google $166 million for "abusing its dominant position in the online ad market." Accusing Google of "at best negligence, at worst opportunism[,]" Google defended itself by claiming it needed to protect consumers "from exploitative and abusive ads."

110.   Similarly, in response to recent news reports of impending antitrust actions against it by federal and state officials for monopolization, Google stated publicly that

CLASS ACTION COMPLAINT

"[c]ompetition is flourishing, and publishers and marketers have enormous choice" when that was plainly incorrect.

111.    Further, Google's anticompetitive monopoly conduct was inherently self-concealing because, as Google knew, its disclosure likely would have led to governmental enforcement activity or civil liability. Search advertising is subject to antitrust regulation, so it was reasonable for Plaintiff and Class members to presume that search advertising was sold in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect search advertising was being sold at supra-competitive prices at any time during the Class Period.

112.    Therefore, by operation of Defendants' fraudulent concealment, the statutes of limitations applicable to Plaintiff's and Class members' claims were tolled throughout the Class Period.

## X.    CLAIMS FOR RELIEF

**COUNT ONE**
**Violation of the Cartwright Act**
**(California Business and Professions Code § 16720 *et seq.*)**
**(Against All Defendants)**

113.    Plaintiff incorporates by reference and realleges each and every preceding paragraph as though fully set forth herein.

114.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

115.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

116.    The relevant market is the U.S. market for search advertising.

CLASS ACTION COMPLAINT

117.   Google has monopoly power in the foregoing market, as evidenced by its high market share and predatory practices that have led to the exclusion of viable market alternatives in the search advertising industry.

118.   Google has executed agreements with distributors of mobile devices and computers to ensure rivals are unable to compete with Google and new market entrants are deterred. This, in conjunction with the conduct Google engaged in with search advertising companies prior to their acquisition, have allowed Google to unreasonably restrain trade in the search advertising market.

119.   These agreements and acquisitions serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the search advertising market.

120.   Google's conduct and practices have substantial anticompetitive effects, including increasing prices advertisers pay to place search advertisements, eliminating competition in the search advertising market, and stifling innovation and alternative search advertising technologies.

121.   It is appropriate to bring this action under the Cartwright Act because many of Google's illegal agreements with third parties were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

122.   Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff paid supra-competitive prices for the relevant products or services.  Plaintiff was further deprived of the ability to choose lower cost alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT

**COUNT TWO**
**Violation of the Unfair Competition Law**
**(California Business and Professions Code § 17200 *et seq*.)**
**(Against All Defendants)**

123.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

124.   Defendants committed acts of unfair competition, as described above, in violation of the Unfair Competition Law ("UCL").

125.   Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, the following:

     a.   Violating the Cartwright Act, as set forth above; and

     b.   Engaging in monopolistic and anticompetitive conduct and restraining trade, and otherwise manipulating the market for search engine services and online advertising in violation of the Cartwright Act.

126.   Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to Plaintiff and members of the Class that is not "reasonably avoidable" by them.

127.   Defendants' conduct, as alleged herein, is and was contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

128.   Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies, as set forth in the Cartwright Act and the California Corporations Code.  Here, Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

CLASS ACTION COMPLAINT

129.   Defendants' conduct, as described above, also constitutes a "fraudulent" business practice within the meaning of the UCL. Defendants' activity with respect to the search engine services and the market for online advertising and online and Android apps fraudulently raised the prices of online advertising and products, including apps, and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty. This conduct was designed to deceive — and did deceive — other market participants about the true supply and demand situation for online advertising in order to artificially increase prices in California.

130.   Plaintiff and members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for the relevant services and products than they would have paid in a competitive market. They are therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code § 17203.

**COUNT THREE**
**Unjust Enrichment**
**(Against All Defendants)**

131.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

132.   Plaintiff brings this claim under the laws of California.

133.   As a result of their unlawful conduct described above, Defendants have been unjustly enriched.

134.   Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and profits on sales of the relevant products and services during the Class Period.

135.   Defendants have benefited from their unlawful acts and it would be inequitable for them to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and members of the Class.

CLASS ACTION COMPLAINT

136.   Plaintiff and members of the Class are entitled to the amount of the Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Class may make claims on a pro rata basis.

137.   Pursuit of any remedies against the firms from which Plaintiff and members of the Class purchased goods and services subject to Defendants' conspiracy would have been futile.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on his behalf and on behalf of the Class defined herein, by adjudging and decreeing:

A.   That the Court determine that this action may be maintained as a class action under C.C.P. § 382, that Plaintiff be certified as Class representative, and Plaintiff's counsel be appointed as counsel for the Class;

B.   That Defendants have contracted, combined and conspired in violation of the Cartwright Act;

C.   That Defendants have violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

D.   That Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

E.   That Plaintiff and the Class recover damages, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against Defendants on behalf of Plaintiff and the Class;

F.   That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, costs, and expenses of the lawsuit, as provided by law;

CLASS ACTION COMPLAINT

G.   That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

H.   That Plaintiff and the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

I.   That Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

    i.   A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

    ii.   Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein;

J.   That Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

K.   That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

L.   For such other and further relief as is just under the circumstances.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT

## XII.    DEMAND FOR JURY TRIAL

Plaintiff and the Class demand a trial by jury of all the claims asserted in this Complaint that are so triable.

Dated:  October 27, 2020

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Anne B. Beste
Albert Y. Chang
Yury A. Kolesnikov

s/ Anne B. Beste
Anne B. Beste

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002
abeste@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff and the Class*

34

CLASS ACTION COMPLAINT